# United States Court of Appeals for the Federal Circuit

2008-1596

CROCS, INC.,

Appellant,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee,

and

DOUBLE DIAMOND DISTRIBUTION, LTD.,

Intervenor,

and

HOLEY SOLES HOLDINGS, LTD., and EFFERVESCENT, INC.,

Intervenors.

James C. Otteson, Wilson Sonsini Goodrich & Rosati, of Palo Alto, California, argued for appellant. With him on the brief were Thomas T. Carmack, of Palo Alto, California, and Michael A. Berta, Ariana M. Chung-Han, and Tung-On Kong, of San Francisco, California. Of counsel was Michael A. Ladra.

Clint A. Gerdine, Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for appellee. With him on the brief were James M. Lyons, General Counsel, and Andrea C. Casson, Assistant General Counsel for Litigation.

Glenn D. Bellamy, Greenebaum, Doll & McDonald PLLC, of Cincinnati, Ohio, for intervenor Double Diamond Distribution, Ltd. With him on the brief was Carrie A. Shufflebarger.

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Washington, DC, argued for intervenors Holey Soles Holdings, Ltd., et al. With him on the brief were Don O. Burley and Jason W. Melvin. Of counsel were Elizabeth A. Niemeyer and Smith R. Brittingham, IV. Of counsel on the brief were Michael G. Martin, William A. Rudy, and Stephen J. Horace, Lathrop & Gage LLP, of Denver, Colorado.

Appealed from: United States International Trade Commission

# United States Court of Appeals for the Federal Circuit

2008-1596

CROCS, INC.,

Appellant,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee,

and

DOUBLE DIAMOND DISTRIBUTION, LTD.,

Intervenor,

and

HOLEY SOLES HOLDINGS, LTD., and EFFEREVESCENT, INC.,

Intervenors.

Appeal from the United States International Trade Commission in Investigation No. 337-TA-567.

_____

DECIDED: February 24, 2010

_____

Before LOURIE, RADER, and PROST, Circuit Judges.

RADER, Circuit Judge.

The United States International Trade Commission ("ITC" or "Commission") found no violation of 19 U.S.C. § 337. Specifically the Commission determined that

U.S. Patent No. 6,993,858 (the "'858 patent") would have been obvious at the time of invention and that none of the intervenors infringed U.S. Patent No. D517,789 (the "'789 patent"). The Commission also determined that Crocs, Inc. ("Crocs") had not satisfied the technical prong of the industry requirement under section 337 for the '789 patent. Because the Commission erred in finding that the prior art taught all of the claimed elements of the '858 patent and incorrectly weighed the secondary considerations, this court reverses the Commission's finding that the '858 patent would have been obvious. Because the Commission also erred in claim construction for the '789 patent, in applying the ordinary observer test for infringement, and in applying the technical prong of the section 337 domestic industry requirement, this court reverses the Commission's determination on the '789 patent.

I.

Crocs is the assignee of the '858 and '789 patents. Crocs's '858 patent, entitled "Breathable Footwear Pieces," issued on February 7, 2006, based on a filing in 2003. The asserted claims of the '858 patent, independent claims 1 and 2, cover foam footwear having a foam base section—an upper portion ("upper") and a sole—and a foam strap. A pair of connectors ties the foam strap to the base section. This connection creates frictional forces that keep the strap in an ideal position at the rear of the base section.

Claim 1 of the '858 patent reads as follows (emphasis added):

A footwear piece comprising:
    [a]    a base section including an upper and a sole formed as a single part manufactured from a moldable foam material; and

    [b]    <u>a strap section formed of a moldable material that is attached at opposite ends thereof to the upper of the base section with plastic</u>

direct contact with the moldable material of the base section and pivots relative to the base section at the connectors;

[c]     wherein the upper includes an open rear region defined by an upper opening perimeter, and wherein frictional forces developed by the contact between the strap section and the base section at the plastic connectors are sufficient to maintain the strap section in place in an intermediary position after pivoting, whereby the strap section lends support to the Achilles portion of the human foot inserted in the open rear region; and

[d]     wherein the upper includes a substantially horizontal portion and a substantially vertical portion forming a toe region that generally follows the contour of a human foot, wherein the toe region tapers from an inner area of the base section where the larger toes exist to an outer area of the base section where the smaller toes exist; and

[e]     wherein the sole includes a bottom surface having front and rear tread patterns longitudinally connected by a flat section.

Claim 2 of the '858 patent reads as follows (emphasis added):

A footwear piece comprising:
[a]     a base section including an upper and a sole formed as a single part manufactured from a moldable foam material; and

[b]     a strap section formed of a molded foam material attached at opposite ends thereof to the base section such that the strap section is in direct contact with the base section and pivots relative to the base section; and

[c]     wherein the upper includes an open rear region defined by an upper opening perimeter; and wherein the sole includes a rear perimeter; and wherein the strap section pivots between a first contact point on the upper opening perimeter and a second contact point on the rear perimeter, and wherein frictional forces developed by the contact between the strap section and the base section at the points of attachment are sufficient to maintain the strap section in place in an intermediary position after pivoting whereby the strap section lends support to the Achilles portion of a human foot inserted in the open rear region; and

[d]     wherein the upper includes a substantially horizontal portion and a substantially vertical portion forming a toe region that generally follows the contour of a human foot, wherein the toe region tapers from the inner area

of the base section where the larger toes exist to the outer area of the base section where the smaller toes exist; and

[e]  wherein a decorative pattern of raised bumps is molded or otherwise created in the upper near to and extending the length of the upper opening perimeter; and

[f]  wherein a plurality of ventilators are formed in both the substantially vertical portion and the substantially horizontal portion, and wherein the ventilators extend up a majority of the height of the vertical portion;

[g]  wherein the vertical portion of the upper includes an upper strip, wherein the ventilators are formed in the upper strip, and wherein the upper strip extends from the toe region to the points of attachment for the strap section, and wherein the sole includes a lower strip that parallels the upper strip and is separated by a line that extends from the toe region to a heel of the footwear piece, and wherein the lower strip vertically rises in a direction toward the heel; and

[h]  wherein the sole includes a bottom surface having front and rear tread patterns longitudinally connected by a flat section without tread patterns bounded by raised side portions; and

[i]  wherein the sole further includes a top surface having a support base including a raised pattern where a foot contacts the support base.

The '789 patent, entitled "Footwear," issued on March 28, 2006, based on a filing in 2004. The '789 patent has one claim and seven figures. It claims an ornamental footwear design as depicted in the figures:



Figure 1



Figure 2                                    Figure 3

Figure 4                                    Figure 5

Figure 6                                    Figure 7

## II.

Crocs of Niwot, Colorado filed a complaint and an amended complaint on March 31, 2006 and April 27, 2006, respectively. Crocs's amended complaint alleged unfair competition under 19 U.S.C. § 337 by respondents due to importation into the United States of foam footwear. Crocs asserted that the imported footwear infringes claims 1 and 2 of the '858 patent, the design in the '789 patent, and Crocs's trade dress. Crocs later withdrew its trade dress complaint. The complaint named eleven respondents: (1)

Collective Licensing International, LLC ("Collective") of Englewood, Colorado; (2) Double Diamond Distribution Ltd. ("Double Diamond") of Saskatoon, Saskatchewan; (3) Effervescent Inc. ("Effervescent") of Fitchburg, Massachusetts; (4) Gen-X Sports, Inc. ("Gen-X") of Toronto, Ontario; (5) Holey Soles Holding Ltd. ("Holey Soles") of Vancouver, British Columbia; (6) Australia Unlimited, Inc. of Seattle, Washington; (7) Cheng's Enterprises Inc. of Carlstadt, New Jersey; (8) D. Myer & Sons, Inc. of Baltimore, Maryland; (9) Inter-Pacific Trading Corp. of Los Angeles, California; (10) Pali Hawaii of Honolulu, Hawaii; and (11) Shaka Shoes of Kailua-Kona, Hawaii. Crocs added a twelfth respondent, Old Dominion Footwear, Inc. of Madison Heights, Virginia, on October 10, 2006. After some settlements and some determinations of non-infringement, five respondents remained in the investigation: (1) Collective; (2) Double Diamond; (3) Effervescent; (4) Gen-X; and (5) Holey Soles. They make accused products in Asia and import them into the United States.

On September 29, 2006, Crocs filed a motion for summary determination of infringement of the '789 patent. Respondents answered with motions for summary determination of non-infringement of the '789 patent. On November 7, 2006, the presiding administrative law judge granted respondents' motions for summary determination of non-infringement of the '789 patent. On review, the Commission issued an Order of Vacatur and Remand of Initial Determination on February 15, 2007. On remand, the administrative judge held an evidentiary hearing from September 7 through 14, 2007.

On April 11, 2008, the administrative judge concluded that the respondents did not violate section 337. Specifically, the administrative judge found that the '789 patent

was not infringed and that Crocs's products, its Beach, Cayman, and Kids Cayman shoes, did not satisfy the technical prong of the domestic industry requirement. In reaching this latter decision, the administrative judge found that Crocs's own products did not practice the patent. Turning to the utility patent, the administrative judge found that claims 1 and 2 of the '858 patent would have been obvious under 35 U.S.C. § 103 in light of two pieces of prior art: (1) the Aqua Clog (the base section of claims 1 and 2 of the '858 patent); and (2) U.S. Patent No. 6,237,249 (the "Aguerre '249 patent").

With respect to the design patent, the '789 patent, the administrative judge provided a detailed verbal claim construction:

> In summary, when the '789 patent is considered as a whole, the visual impression created by the claimed design includes: footwear having a foot opening with a strap that may or may not include any patterning, is attached to the body of the footwear by two round connectors, is of uniform width between the two round connectors, has a wrench-head like shape at the point of attachment, and extends to the heel of the shoe; with round holes on the roof of the upper placed in a systematic pattern; with trapezoid-shaped holes evenly spaced around the sidewall of the upper including the front portion; with a relatively flat sole (except for upward curvature in the toe and heel) that may or may not contain tread on the upper and lower portions of the sole, but if tread exists, does not cover the entire sole, and scalloped indentations that extend from the side of the sole in the middle portion that curve toward each other.

Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond, at 80 (April 11, 2008) (Inv. No. 337-TA-567). Based on this description, the administrative judge found the Holey Soles and Gen-X accused products did not infringe because their strap is not of uniform thickness and does not extend to the heel of the shoe. The same reasoning excused the Collective and Effervescent accused products from infringement but the administrative judge added the further explanation that these imports did not have round holes in the upper portion.

He found that the Double Diamond accused products did not infringe because each of the accused products has at least one of the following: a strap that does not have uniform thickness and does not extend to the heel of the shoe; holes in the upper that are not round; holes in the upper that are placed in a web-shaped, not systematic, pattern; or a tread pattern that covers the entire sole.

On April 24, 2008, Crocs, CLI, and the Commission investigative attorney ("IA") filed petitions for review with the Commission. On June 18, 2008, the Commission agreed to review the following issues: (1) the findings concerning non-infringement of the '789 patent and the lack of satisfaction of the technical prong of the domestic industry requirement; and (2) the finding of invalidity with respect to the '858 patent. The Commission did not review any other issues.

On July 25, 2008, the Commission affirmed the finding of no infringement and no domestic industry for the '789 patent, and obviousness for the '858 patent. The Commission augmented the discussion in the initial determination about non-infringement of the '789 patent and lack of satisfaction of the technical prong of the domestic industry requirement by finding that the accused shoes and Crocs's shoes lacked even spacing of ventilator holes around the front (toe) portion of the upper as shown in the '789 patent design.

For obviousness of the '858 patent, the Commission found that the administrative judge properly concluded that the principal remaining difference between the prior art and the claimed invention is the use of foam for the strap. The Commission upheld the administrative judge's finding that the prior art showed foam straps. Finally, on secondary considerations of non-obviousness, the Commission found that Crocs did not

show a nexus between its claimed shoes and their commercial success. The Commission, unlike the administrative judge, did find that at least one respondent copied Crocs's commercially available shoe. The Commission held that the evidence of copying, however, did not disturb the prima facie case of obviousness.

Crocs appeals the Commission's final determination. Collective and Gen-X were dismissed as intervenors from the appeal. Double Diamond, Effervescent, and Holey Soles are the remaining intervenors.

III.

This court reviews the Commission's legal determinations without deference and its factual findings for substantial evidence. Corning Glass Works v. U.S. Int'l Trade Comm'n, 799 F.2d 1559, 1565 (Fed. Cir. 1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison Col. v. NLRB, 305 U.S. 197, 229 (1938)).

A.

This court has cautioned, and continues to caution, trial courts about excessive reliance on a detailed verbal description in a design infringement case. See, e.g., Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 679 (Fed. Cir. 2008) (en banc). In Egyptian Goddess, this court warned that misplaced reliance on a detailed verbal description of the claimed design risks undue emphasis on particular features of the design rather than examination of the design as a whole. Id. at 679–80. In many

cases, the considerable effort in fashioning a detailed verbal description does not contribute enough to the infringement analysis to justify the endeavor. See id. at 680. Depictions of the claimed design in words can easily distract from the proper infringement analysis of the ornamental patterns and drawings.

Design patents are typically claimed as shown in drawings, and claim construction must be adapted to a pictorial setting. See, e.g., Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1377 (Fed. Cir. 2002) (construing a design patent claim as meaning "a tray of a certain design as shown in Figures 1–3"). Thus an illustration depicts a design better "than it could be by any description and a description would probably not be intelligible without the illustration." Dobson v. Dornan, 118 U.S. 10, 14 (1886). "[A]s a rule, the illustration in the drawing views is its own best description." Manual of Patent Examining Procedure § 1503.01 (8th ed. 2006).

This case shows the dangers of reliance on a detailed verbal claim construction. The claim construction focused on particular features of the '789 patent design and led the administrative judge and the Commission away from consideration of the design as a whole. This error is apparent in the Commission's explicit reference to two details required by the written claim construction but not by the '789 drawings: (1) a strap of uniform width, and (2) holes evenly spaced around the sidewall of the upper. As shown in Figure 1 of the '789 patent, the strap bulges to a greater width at the middle of the strap on the far left of the figure. Thus, the design figure does not require a strap of uniform width between the two round connectors. Also, as shown in Figure 4 of the '789 patent, the holes are not evenly spaced. Figure 4 shows a gap in the spacing (particularly towards the big toe). Nonetheless, the written claim description required

uniform strap width and uniform hole spacing—contrary to the claimed invention. This error distorts the infringement analysis by the ordinary observer viewing the design as a whole. The administrative judge and the Commission needed to apply the ordinary observer test to "the design shown in Figures 1–7."

B.

In determining whether an accused product infringes a patented design, this court applies the "ordinary observer" test, without any "point of novelty" perspective. Egyptian Goddess, 543 F.3d at 678. To show infringement under the proper test, an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design. See id. at 681. When the differences between the claimed and accused designs are viewed in light of the prior art, the attention of the hypothetical ordinary observer may be drawn to those aspects of the claimed design that differ from the prior art. Id. If the claimed design is close to the prior art designs, small differences between the accused design and the claimed design assume more importance to the eye of the hypothetical ordinary observer. Id. The ordinary observer, however, will likely attach importance to those differences depending on the overall effect of those differences on the design. Id. Even if the claimed design simply combines old features in the prior art, it may still create an overall appearance deceptively similar to the accused design. In that case, this court will uphold a finding of infringement. Id. at 677–78. In other words, "the deception that arises is a result of the similarities in the overall design, not of similarities in ornamental features in isolation." Amini Innovation, 439 F.3d at 1371. The ordinary observer test applies to the patented design in its entirety, as it is claimed. See Braun, Inc. v. Dynamics Corp. of Am., 975

F.2d 815, 820 (Fed. Cir. 1992). "[M]inor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement." Payless Shoesource, 998 F.2d at 991 (quoting Litton Sys. Inc. v. Whirlpool, 728 F.2d 1423, 1444 (Fed. Cir. 1984)).

Turning to this case, the Commission placed undue emphasis on particular details of its written description of the patented design. Those details became a mistaken checklist for infringement. Without a view to the design as a whole, the Commission used minor differences between the patented design and the accused products to prevent a finding of infringement. In other words, the concentration on small differences in isolation distracted from the overall impression of the claimed ornamental features.

The proper comparison requires a side-by-side view of the drawings of the '789 patent design and the accused products. The depiction below shows the '789 patent (on the left) and the Double Diamond Revised Beach DAWGS™ (on the right).



The depiction below compares the '789 patent (on the left), the Groovy DAWGS™ shoes (in the center), and Big DAWGS™ shoes (on the right).



The comparison below shows the '789 patent (on the left) and the Double Diamond Original Beach DAWGS™ shoes (on the right).



The depiction below compares the '789 patent (on the left), the Holey Soles Explorer shoes (in the center), and Holey Soles Cricket shoes (on the right).



A final comparison places the '789 patent on the left and the Effervescent Waldies AT shoe on the right.



These side-by-side comparisons of the '789 patent design and the accused products suggest that an ordinary observer, familiar with the prior art designs, would be

deceived into believing the accused products are the same as the patented design. In one comparison after another, the shoes appear nearly identical. If the claimed design and the accused designs were arrayed in matching colors and mixed up randomly, this court is not confident that an ordinary observer could properly restore them to their original order without very careful and prolonged effort.

One of the overall effects of the design is the interaction between the strap assembly portion and the base portion of the shoes where the strap is attached to the base. Multiple major design lines and curves converge at that point creating a focal point attracting the eye of the ordinary observer when viewing the overall effect of the design. Another overall effect of the design is a visual theme of rounded curves and ellipses throughout the design, including the strap forming a sort of continuation of the sidewall of the base to create a visually continuous ring encircling the entire shoe. Other examples of rounded curves or ellipses in the design are the ellipses formed by the strap and the foot opening in the base. Both the claimed design and the accused designs have these overall effects.

In any event, this court perceives that the accused products embody the overall effect of the '789 design in sufficient detail and clarity to cause market confusion. Thus, the accused products infringe the '789 design.

C.

One requirement of a patent-based section 337 action is that a domestic industry "relating to the articles protected by the patent . . . exists or is in the process of being established." 19 U.S.C. § 1337(a)(2) (2006). To determine the relationship between a domestic industry and protected articles (the "technical prong" of the domestic industry

requirement), the Commission determines whether the industry produces articles covered by the asserted claims. The test for the technical prong of the industry requirement "is essentially the same as that for infringement, i.e., a comparison of domestic products to the asserted claims." Alloc, Inc. v. Int'l Trade Comm'n, 342 F.3d 1361, 1375 (Fed. Cir. 2003). In other words, the technical prong requires proof that the patent claims cover the articles of manufacture that establish the domestic industry. Put simply, the complainant must practice its own patent.

Because the test for the technical prong is essentially the same as for infringement, this court uses the ordinary observer test to compare Crocs's own shoe products to the '789 patent design. This court has stated that test above. Once again, the test applies best in a side-by-side comparison of the drawings of the '789 patent design and the Crocs products.

The depiction below places the '789 patent on the left and the Crocs Beach shoe on the right. The Crocs Cayman and Kids Cayman shoes are practically identical to the Crocs Beach shoe, so this court uses only that product for comparison.



As illustrated by the side-by-side comparison of the '789 patent design and the Crocs Beach shoe, an ordinary observer, familiar with the prior art designs, would consider the Crocs shoes the same as the patented design. The overall effects of the design in the '789 patent and the Crocs shoes are the same. One of the overall effects of the design present in both the '789 patent and Crocs shoes is the focal point where multiple major design lines and curves converge at the point where the strap is attached to the base. Another is the visual theme of rounded curves and ellipses throughout both designs. Crocs's shoes embody the overall effect of the '789 design in light of the prior art; they "infringe" the '789 design. Thus, Crocs satisfies the technical prong of the domestic industry requirement.

IV.

Obviousness is a question of law based on underlying factual inquiries including: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the prior art and the claimed invention; and (4) the extent of any objective indicia of non-obviousness. Monarch Knitting Mach. Corp. v. Sulzer Morat GMBH, 139 F.3d 877, 881 (Fed. Cir. 1998). This court reviews the Commission's legal determinations without deference and its factual findings for substantial evidence. Corning Glass Works v. U.S. Int'l Trade Comm'n, 799 F.2d 1559, 1565 (Fed. Cir. 1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison Col. v. NLRB, 305 U.S. 197, 229 (1938)).

The Commission relied on two prior art references to find the '858 patent obvious: (1) the Aqua Clog (the base of the '858 shoe); and (2) the Aguerre '249 patent. The '858 patent, however, is not simply a combination of elements found in the prior art. The '858 invention includes a foam strap riveted to a foam base with direct contact—an important part of the combination not in the prior art.

The record shows that the prior art would actually discourage and teach away from the use of foam straps. An ordinary artisan in this field would not add a foam strap to the foam Aqua Clog because foam was likely to stretch and deform, in addition to causing discomfort for a wearer. The prior art depicts foam as unsuitable for straps. The nature of the problem—attaching footwear to the foot—required under the prior art a material with enough elasticity around the Achilles tendon to allow "give and take" as the foot moved in the shoe. A firm inelastic material like foam was likely to cause abrasions at the back of the foot. In addition, foam had another deficient property.

Foam, according to the prior art, did not have a good memory, meaning that the stretching of normal use would likely cause the material to elongate or compress. These deformations would defeat the strap long before the normal life span of the footwear combination. Thus, the prior art only used a non-elastic material for attaching footwear in combination with a buckle or another mechanism that could adjust the length of the strap for a comfortable fit and for a reduction in stretching and deformation.

Despite the prior art warnings against inelastic and non-adjustable foam straps, the '858 patent employed foam without a buckle or some other similar adjustment mechanism. Moreover the '858 patent riveted the inelastic foam directly to the base of the footwear. This claimed feature defied the prior art's caution against the poor characteristics of a foam strap. Indeed no prior art reference disclosed a foam strap riveted to a shoe. The Aguerre '249 patent taught elastic straps or straps made of other flexible materials. In Aguerre, these flexible straps attached a light sandal to the foot. Aguerre '249 patent col.7 ll.53–57.

The record shows that Crocs's expert testified that artisans of ordinary skill in this art thought that foam shoe components connected through perforations such as by stitching or riveting were excessively prone to tearing. To minimize this record evidence, the Commission relied on In re Gurley, in which this court stated that a "known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use." 27 F.3d 551, 553 (Fed. Cir. 1994). In this case, however, foam straps were not simply "somewhat inferior." Rather the prior art showed that foam was an unsuitable material for shoe straps. Although known in the art, foam was known as unsuitable. The Commission

unreasonably determined that foam straps were known in the art without acknowledging that those prior art references rendered the material out of place for use as a strap. Thus, the Commission could not properly conclude that a person of ordinary skill would use foam to attach a foam base portion to a wearer.

The Commission also held that choosing foam as the material for a strap for a shoe that is otherwise made of foam is a logical modification because it produces a shoe of uniform composition. To the contrary, a foam strap is not a logical modification because foam was known to be an unsuitable material that was prone to tearing. One of ordinary skill would have no reason to use foam straps in combination with a foam base portion. Thus, the new combination would not have been obvious at the time of the invention of the '858 patent.

Even if the '858 patent were a combination of known elements according to their established functions—which it is not as foam straps were not in the prior art—it yields more than predictable results; thus, it is non-obvious. See KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 417 (2007). The "passive restraint system" employed by the '858 patent requires that: (1) the strap section is in direct contact with the base section, and (2) frictional forces developed by the contact between the strap section and the base section at the points of attachment are sufficient to maintain the strap section in place in an intermediary position after pivoting, whereby the strap section lends support to the Achilles portion of a human foot. '858 patent col.9 ll.42–53, col.10 ll.11–24. The specification further describes the "passive restraint system" of the invention:

> [T]he strap serves the utilitarian purpose of lending support to the Achilles portion of the human foot, thus helping to maintain footwear piece 100 in position on the human foot. In some embodiments, a frictional force developed between strap 120 and upper 150 at the location of the rivets is

> sufficient to maintain strap 120 in place. This helps to assure that strap 120 remains in place even when the Achilles part of the foot is not pressing against strap 120. Without such friction, strap 120 would succumb to gravity and fall to a position where the foot would not be supported.

Id. at col.6 ll.17–29.

The inventor of the '858 patent, Scott Seamans, testified that the unique frictional forces that develop between the foam components keep the strap in place so that it can maintain the shoe in the correct position on the foot without constant contact with the wearer's Achilles. Instead of pushing the foot forward into the shoe—like prior art straps that are elastic or length adjustable—the '858 patent's passive restraint system allows the strap to "lend support" only when necessary to keep the shoe positioned correctly on the foot. See id. ("[T]he Achilles part of the foot is not [always] pressing against strap."). This feature facilitates a loose anatomical fit that makes the claimed invention more comfortable than prior art products.

The administrative judge recognized this distinction between the '858 invention and the Aguerre '249 patent:

> Now, it is true that the strap disclosed in the Aguerre '249 patent was made of material other than foam and was adjustable and elastic so that it held the foot snugly in the shoe. By contrast, the '858 patent discloses a firm foam strap that acts as a passive restraint to the Achilles portion of the foot and can be set in various fixed position[s] because of the friction created by the direct contact between the upper portion of the base and the strap.

Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond, at 62 (Apr. 11, 2008) (Inv. No. 337-TA-567). Thus, the administrative judge found that the Aguerre '249 patent did not teach a strap system that passively restrains the Achilles portion of the foot. The Aguerre '249 patent lacks a

foam base or strap, so it cannot have foam-to-foam frictional contact that is essential to maintain the strap in proper passive restraint position on the wearer's foot. Rather, Aguerre repeatedly teaches that the "rear heel strap" is made of an "elastic or other flexible material" to secure the sandal to the foot. Aguerre '249 patent col.2 ll.37–39, col.8 ll.22–27. Not only was it impossible for the Aguerre shoe to have foam-to-foam frictional contact, the Aguerre '249 patent actually taught that friction was a problem, not a benefit. See id. at col.9 ll.15–34. The prior art even suggested that nylon washer separators would help ensure free rotation of the strap without friction. Id. Thus, the prior art did not include any hint or suggestion or even common sense reason to include the passive restraint system of the '858 patent at the time of the invention. The prior art, in fact, taught away from the passive restraint system. Because this claimed feature of the invention yielded more than predictable results, the '858 patent for this reason also would not have been obvious at the time of invention.

Secondary considerations "can be the most probative evidence of non-obviousness in the record, and enables the . . . court to avert the trap of hindsight." Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc., 807 F.2d 955, 960 (Fed. Cir. 1986). Judge Learned Hand appreciated the importance of secondary considerations:

> In appraising an inventor's contribution to the art, as we have often said, the most reliable test is to look at the situation before and after it appears. . . . Courts, made up of laymen as they must be, are likely either to underrate, or to overrate, the difficulties in making new and profitable discoveries in fields with which they cannot be familiar; and, so far as it is available, they had best appraise the originality involved by the circumstances which preceded, attended and succeeded the appearance of the invention . . . . We have repeatedly declared that in our judgment this analysis [evidence of secondary considerations] is more reliable than prior conclusions drawn from vaporous, and almost inevitably self-dependent, general propositions.

Safety Car Heating & Lighting Co. v. Gen. Elec. Co., 155 F.2d 937, 939 (2d Cir. 1946). Secondary considerations "may often establish that an invention appearing to have been obvious in light of the prior art was not." Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538 (Fed. Cir. 1983). Indeed this court has recently reiterated: "This evidence is not just a cumulative or confirmatory part of the obviousness calculus but constitutes independent evidence of nonobviousness." Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc., 520 F.3d 1358, 1365 (Fed. Cir. 2008) (citing Catalina Lighting, Inc. v. Lamps Plus, Inc., 295 F.3d 1277, 1288 (Fed. Cir. 2002) ("Objective indicia may often be the most probative and cogent evidence of nonobviousness in the record.") (internal citation omitted)).

The Commission found that three models of Crocs shoes practice claims 1 and 2 of the '858 patent: the Beach, Cayman, and Kids Cayman shoes. It found that those three models of Crocs shoes have enjoyed a great deal of commercial success. A prima facie case of nexus is made when the patentee shows both that there is commercial success, and that the product that is commercially successful is the invention disclosed and claimed in the patent. See In re GPAC Inc., 57 F.3d 1573, 1580 (Fed. Cir. 1995). Once the patentee demonstrates a prima facie nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger. See Demaco Corp. v. F. Von Lansgdorff Licensing Ltd., 851 F.2d 1387 (Fed. Cir. 1988).

Because the Commission found, based on substantial evidence, that Crocs shoes practice the '858 patent and that the Crocs shoes were commercially successful, Crocs established a prima facie case of nexus. The record discloses little or no evidence to rebut this prima facie case of nexus. This court is aware that many market

forces unrelated to the inventiveness of the patent may influence commercial success, but the intervenors must make a convincing case that those market forces indeed were the likely cause of the success. This record does not show any effort to make that rebuttal case. In the absence of a rebuttal, Crocs may add its commercial success to its proofs of non-obviousness. This court gives even more credit to the administrative judge's finding of substantial industry praise for the claimed invention and the products covered by the claimed invention. Still another objective measure tips the scale farther in the direction of non-obviousness, namely the Commission's finding of copying. Copying may indeed be another form of flattering praise for inventive features. In the absence of any record evidence attributing these secondary considerations to causes other than the claimed invention, Crocs may rely on this added support for non-obviousness.

In light of the prior art teaching away from the claimed invention and the claimed features that do not appear in the prior art, this court detects several reasons at the time of the invention that an ordinary artisan would not have been motivated even to try, let alone make, this inventive combination. In addition, the secondary considerations supply additional evidence of non-obviousness. Thus, this court reverses the Commission's holding that the '858 patent would have been obvious and easily attainable at the time of invention.

V.

For the foregoing reasons, this court reverses the Commission's determination that the '789 patent was not infringed, that Crocs did not satisfy the technical prong of the domestic industry requirement of section 337 relating to the '789 patent, and that the

'858 patent would have been obvious.  This court remands the investigation to the Commission for a determination of infringement of the '858 patent and any appropriate remedies.

REVERSED AND REMANDED.

<u>COSTS</u>

Each party shall bear its own costs.