# United States Court of Appeals
# for the Federal Circuit

_____

**MRC INNOVATIONS, INC.,**
*Plaintiff-Appellant,*

v.

**HUNTER MFG., LLP,**
*Defendant-Appellee,*

AND

**CDI INTERNATIONAL, INC.,**
*Defendant-Appellee.*

_____

2013-1433

_____

Appeal from the United States District Court for the Northern District of Ohio in No. 12-CV-0684, Judge Patricia A. Gaughan.

_____

Decided: April 2, 2014

_____

RANDOLPH E. DIGGES, III, of Rankin, Hill & Clark LLP, of North Olmsted, Ohio, argued for plaintiff-appellant. With him on the brief were ROBERT A. SIDOTI. Of counsel was JONATHAN A. WITHROW.

PERRY J. SAIDMAN, Saidman DesignLaw Group, LLC, of Silver Spring, Maryland, argued for defendants-

appellees.    With him on the brief were ANDREW D. DORISIO and TREVOR T. GRAVES, King & Schickli, PLLC, of Lexington, Kentucky, and EDWARD D. MANZO and MARK J. MURPHY, Husch Blackwell LLP, of Chicago, Illinois.

————————————

Before RADER, *Chief Judge,* PROST and CHEN, *Circuit Judges.*

PROST, *Circuit Judge.*

MRC Innovations, Inc. appeals from a final judgment of the U.S. District Court for the Northern District of Ohio granting summary judgment of invalidity with respect to U.S. Design Patent Nos. D634,488 S ("'488 patent") and D634,487 S ("'487 patent").  For the reasons stated below, we affirm.

BACKGROUND

MRC is the owner by assignment of both patents-in-suit.  The '488 patent claims an ornamental design for a football jersey for a dog, while the '487 patent does the same for a baseball jersey, as shown below:



| '488 Patent | '487 Patent |
| --- | --- |



Mark Cohen is the named inventor of both patents; he is the principal shareholder of MRC and assigned his rights in both patents to that company. Appellee Hunter Manufacturing, LLP, is a retailer of licensed sports consumer products, including pet jerseys. Prior to September 9, 2009, Hunter purchased pet jerseys for dogs from Mark Cohen through companies with which he was affiliated. For example, Cohen supplied Hunter with a "V2" football jersey through the Stephen Gould Corporation and through Fun-in-Games, Inc. ("FiG"). Similarly, Cohen supplied Hunter, through FiG, with a green pet jersey bearing a Philadelphia Eagles logo, which Hunter then sold through third-party retailers such as Wal-Mart and PetSmart prior to July 30, 2009. The V2 and Eagles jerseys are depicted below:



Cohen asserts that in 2009 he designed another pet jersey, known as the "V3" jersey, which would later become the subject of the '488 patent. Hunter began purchasing the V3 jersey from FiG sometime after September 8, 2009. On September 8, 2010, Cohen filed a patent application for both the V3 jersey and the baseball equivalent that would later become the subject of the '487 patent.

In December 2010, Cohen informed Hunter that he no longer intended to do business with Hunter because Hunter was having difficulty making payments. Hunter then sought proposals from other companies to manufacture and supply it with pet jerseys like the V3. Ultimately, Hunter contracted with another supplier, appellee CDI International, Inc., to supply Hunter with pet jerseys.

Both patents-in-suit eventually issued on March 15, 2011.

MRC filed suit against both Hunter and CDI for willful infringement of both patents.  The district court granted summary judgment in favor of Hunter and CDI on the grounds that both patents are invalid as obvious under 35 U.S.C. § 103(a).  *MRC Innovations, Inc. v. Hunter Mfg., LLP*, 921 F. Supp. 2d 800, 812 (N.D. Ohio 2013).  The district court denied summary judgment of invalidity based on 35 U.S.C. § 112.  *Id.* at 810-11.

MRC appealed the grant of summary judgment.  We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

This court reviews a district court's grant of summary judgment under the law of the regional circuit.  *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1344 (Fed. Cir. 2012).  The Sixth Circuit reviews a district court's grant of summary judgment de novo.  *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 569 (6th Cir. 2008).  Summary judgment is appropriate if, viewing the evidence in the light most favorable to the non-moving party, the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## I. The '488 Patent

The district court concluded that the '488 patent would have been obvious in view of several prior art pet jerseys.  MRC now appeals that determination.

Obviousness is a question of law that is reviewed de novo, based on underlying factual questions that are reviewed for clear error following a bench trial.  *Honeywell Int'l, Inc. v. United States*, 609 F.3d 1292, 1297 (Fed. Cir. 2010).  The underlying factual inquiries include: (1)

the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of non-obviousness. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17 (1966). Summary judgment of obviousness is appropriate if "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors." *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1341 (Fed. Cir. 2010) (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007)).

In the context of design patents, "'the ultimate inquiry under section 103 is whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved.'" *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1380-81 (Fed. Cir. 2009) (quoting *Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 103 (Fed. Cir. 1996)). To answer this question, a court must first determine "whether one of ordinary skill would have combined teachings of the prior art to create the same overall visual appearance as the claimed design." *Durling*, 101 F.3d at 103. That inquiry involves a two-step process. First, the court must identify "a single reference, 'a something in existence, the design characteristics of which are basically the same as the claimed design.'" *Id.* (quoting *In re Rosen*, 673 F.2d 388, 391 (CCPA 1982)). The "basically the same" test requires consideration of the "visual impression created by the patented design as a whole." *Id.* We have noted that "the trial court judge may determine almost instinctively whether the two designs create basically the same visual impression," but "must communicate the reasoning behind that decision." *Id.*

Once the primary reference is found, other "secondary" references "may be used to modify it to create a design that has the same overall visual appearance as the

claimed design." *Id.* These secondary references must be "'so related [to the primary reference] that the appearance of certain ornamental features in one would suggest the application of those features to the other.'" *Id.* (quoting *In re Borden*, 90 F.3d 1570, 1575 (Fed. Cir. 1996) (alteration in original)).

## A. Primary Reference

The district court used the "Eagles" pet jersey as the "primary reference" under step one of the *Durling* analysis. *MRC*, 921 F. Supp. 2d at 809. MRC argues that this was legally erroneous because there are significant differences between the Eagles jersey and the patented design of the '488 patent. Specifically, there are three differences: (1) the patented design has a V-neck collar where the Eagles jersey has a round neck; (2) the patented design contains an interlock fabric panel on the side portion of the design rather than mesh; and (3) the patented design contains additional ornamental surge stitching on the rear portion of the jersey. MRC argues that the district court overlooked these differences by focusing on the claimed design at "too high a level of abstraction." *High Point Design LLC v. Buyers Direct, Inc.*, 730 F.3d 1301, 1314 (Fed. Cir. 2013) (citing *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 678 F.3d 1314, 1331 (Fed. Cir. 2012)). If the district court had translated the claimed design into a verbal description as required by *High Point*, MRC insists, it would have concluded that neither the Eagles jersey nor any other prior art reference contained design characteristics that were "basically the same" as the claimed design.

As an initial matter, it is true that the district court did not expressly undertake to translate the claimed design into a verbal description. However, *High Point* makes clear that the purpose of requiring district courts to describe the claimed design in words is so that the parties and appellate courts can discern the trial court's

reasoning in identifying a primary reference. *See id.* (citing *Durling*, 101 F.3d at 103). It is entirely clear from the district court's opinion what it considered to be the relevant design characteristics of the '488 patented design.

First, the district court pointed out three key similarities between the claimed design and the Eagles jersey: an opening at the collar portion for the head, two openings and sleeves stitched to the body of the jersey for limbs, and a body portion on which a football logo is applied. *MRC*, 921 F. Supp. 2d at 809. If the district court's analysis had ended there, it might indeed have failed to meet the *High Point* verbal description requirement. However, the district court went on to point out two additional similarities between the two designs: first, the Eagles jersey is made "primarily of a mesh and interlock fabric"; and second, it contains at least some ornamental surge stitching—both features found in the '488 claimed design. *Id.* The district court also went on to acknowledge the three major differences between the two designs that are enumerated above. *See id.* Taking all of those things together (the at least five design characteristics that the claimed design shares with the Eagles jersey and three design characteristics that differ from it), the district court painted a clear picture of the claimed design. The district court did far more than merely ask whether the Eagles jersey disclosed the "general concept" of a pet jersey; it thoroughly considered the "distinctive 'visual appearances' of the reference and the claimed design." *Apple*, 678 F.3d at 1332 (quoting *Durling*, 101 F.3d at 104). Thus, the district court did not err by failing to provide an express verbal description of the claimed design; rather, it described the claimed design in the context of comparing it to the prior art.

Nor did the district court err in finding that the design characteristics of the '488 design created "basically the same" overall visual impression as the Eagles jersey

prior art reference. As the district court noted, both designs contain the same overall shape, similar fabric, and ornamental surge stitching. That there are slight differences in the precise placement of the interlock fabric and the ornamental stitching does not defeat a claim of obviousness; if the designs were identical, no obviousness analysis would be required.[1] Indeed, we have permitted prior art designs to serve as "primary references" when their differences are as great or greater than the differences in this case. *See Jore Corp. v. Kouvato, Inc.*, 117 F. App'x 761, 763 (Fed. Cir. 2005) (finding prior art drill bit to be a primary reference despite containing a smooth cylindrical shaft rather than the grooved hexagonal shaft of the claimed design); *In re Nalbandian*, 661 F.2d 1214, 1217-18 (CCPA 1981) (finding tweezer design obvious in light of prior art reference that contained vertical rather

---

[1]     This conclusion is not inconsistent with the law of this circuit on design patent infringement. In that context, we have often noted that design patents have "almost no scope" beyond the precise images shown in the drawings. *In re Mann*, 861 F.2d 1581, 1582 (Fed. Cir. 1988). However, in practice, our focus on the "overall visual appearance" of a claimed design rather than on individual features has led us to find products infringing despite differences in specific ornamental features. For example, in *Crocs, Inc. v. International Trade Commission*, 598 F.3d 1294 (Fed. Cir. 2010), we concluded that all of the accused products infringed the asserted design patents despite the fact that two of the infringing products (the Groovy DAWGS™ shoes and Big DAWGS™ shoes) contained a wider shoe front with an additional row of holes, and another infringing product (the Effervescent Waldies AT shoe) contained square holes on the top of the shoe rather than round ones. *Id.* at 1303-06.

than horizontal fluting and straight rather than curved pincers).[2]

*Apple*, 678 F.3d 1314, on which MRC relies, is not to the contrary. There, we faulted the district court for finding that the prior art Fidler tablet could serve as a primary reference to the patented tablet design. *Id.* at 1330-31. However, in that case we noted "substantial differences in the overall visual appearance between the patented design and the Fidler reference," and described no fewer than six differences between the two products. *Id.* Among other things, the Fidler tablet was asymmetrical where the patented tablet was symmetrical; it contained a sunken screen that created a "picture frame" effect rather than the visual impression of "an unbroken slab of glass extending from edge to edge on the front side of the [patented] tablet"; and it contained two card-like projections and an indentation on its sides rather than the smooth sides of the claimed design. *Id.* These differences rendered the Fidler tablet significantly different in overall visual appearance from the patented design; the same cannot be said of the '488 patented design and the Eagles jersey, which we agree are "basically the same."[3]

-----

[2]     The relatively few other cases in which we evaluated whether a prior art design can serve as a "primary reference" are unhelpful, as they either conclude that a reference that is *more* similar to the claimed design than we have in this case *can* serve as a primary reference, *see, e.g.*, *Titan Tire Corp.*, 566 F.3d at 1380-82; *In re Borden*, 90 F.3d at 1575, or that a *less* similar reference *cannot*, *see, e.g.*, *Durling*, 101 F.3d at 103-04; *Rosen*, 673 F.2d at 391.

[3]     Alternatively, the district court could have relied on the V2 jersey as the primary reference. The only differences between the V2 jersey and the claimed design

B. Secondary References

After concluding that the Eagles jersey could be a "primary reference," the district court determined that the V2 jersey and another reference known as the "Sporty K9" jersey were "so related to the primary reference" that they could serve as "secondary references" that would motivate the skilled artisan to make the claimed design. *MRC*, 921 F. Supp. 2d at 809.

The district court found that both jerseys suggested the use of a V-neck pattern and non-mesh fabric on the side panels—the first two differences described above. MRC argues that the district court erred by failing to explain *why* a skilled artisan would have chosen to incorporate those features of the V2 and Sporty K9 jerseys with the Eagles jersey.

We disagree. It is true that "[i]n order for secondary references to be considered, . . . there must be some suggestion in the prior art to modify the basic design with features from the secondary references." *In re Borden*, 90 F.3d at 1574. However, we have explained this requirement to mean that "the teachings of prior art designs may

---

are: (1) that the V2 jersey does not contain an "interlock" fabric panel; (2) it has "drop" sleeves while the claimed jersey has "raglan-style" sleeves; and (3) the V2 jersey lacks any ornamental surge stitching. *MRC*, 921 F. Supp. 2d at 807. A side-by-side comparison of the two designs demonstrates that of those three differences, only the ornamental surge stitching truly alters the "overall visual appearance" of the design. Moreover, the ornamental stitching on the claimed design is suggested by the seam lines on the V2 jersey, further minimizing the difference in overall appearance. Thus, either the "Eagles" jersey or the V2 jersey could have served as a "primary reference" for purposes of the obviousness analysis.

be combined only when the designs are 'so related that the appearance of certain ornamental features in one would suggest the application of those features to the other.'" *Id.* at 1575 (quoting *In re Glavas*, 230 F.2d 447, 450 (CCPA 1956)). In other words, it is the mere similarity in appearance that itself provides the suggestion that one should apply certain features to another design.[4]

*In re Borden* also discussed what is required for a reference to be considered sufficiently "related" for that test to apply. There, we noted that the secondary references were "closely akin" to the claimed design, and relied heavily on the fact that "the two missing design elements [were] not taken from unrelated references, but [were] found in other dual-chamber containers." *Id.* Thus, those references could be used "to bridge the small gap between

---

[4]    MRC argues that this conclusion is "clearly improper" in light of our recent decision in *High Point*, 730 F.3d 1301. However, that case is not on point. There, we faulted the district court for failing to explain the reasoning behind its determination that a given "primary reference" was "basically the same as the claimed design," and so we remanded for the district court to do a side-by-side comparison of the designs and determine if they create the same visual impression. *Id.* at 1314. The district court here did exactly that, when it listed five specific features that rendered the Eagles jersey "basically the same" as the patented design and explained that the three minor differences did not defeat the similarity in overall visual appearance. *See supra* Section I.A. *High Point* did not address the situation presented here, where the district court relied on the visual similarity between the patented design and the various secondary references to conclude that the secondary references would have suggested particular design modifications to a skilled designer.

the [primary] container and Borden's claimed design." *Id.* So too, here, the secondary references that the district court relied on were not furniture, or drapes, or dresses, or even human football jerseys; they were football jerseys designed to be worn by dogs. Moreover, as discussed above, the V2 could easily have served as a primary reference itself, so similar is its overall visual appearance to that of the claimed design and the Eagles jersey. *See supra* n.3. We therefore agree that those references were "so related" to the Eagles jersey that the striking similarity in appearance across all three jerseys would have motivated a skilled designer to combine features from one with features of another.

With respect to the only remaining difference between the Eagles jersey and the '488 claimed design—the presence of additional ornamental surge stitching running down the rear of the jersey—the district court acknowledged that no prior art reference contained exactly that same stitching on the rear of the jersey, but nevertheless concluded that this was not a "substantial" difference that created a patentably distinct design, but rather was a "*de minimis* change[] which would be well within the skill of an ordinary designer in the art." *MRC*, 921 F. Supp. 2d at 809 (citing *In re Carter*, 673 F.2d 1378, 1380 (CCPA 1982)).

MRC argues that adding *any* ornamental feature to a primary reference that is not suggested by the prior art is, by definition, more than de minimis.[5] But our case law

---

[5] Alternatively, MRC argues that, at the very least, the differences between the prior art and the claimed design are not insignificant *as a matter of law*, but rather give rise to a genuine issue of material fact as to how the designs would be viewed by an ordinary designer. However, as explained below, we believe that, even construing the evidence in the light most favorable to MRC, no

plainly contradicts that position; on numerous occasions we have invalidated design patents despite the inclusion of ornamental features that were entirely absent from prior art designs. *See, e.g.*, *In re Nalbandian*, 661 F.2d at 1217 (different shape of fluting on finger grips and different shape of pincers were de minim*i*s differences in design for tweezers); *In re Carter*, 673 F.2d at 1380 (modifications to the waistband of an infant garment were "de minimis changes which would be well within the skill of an ordinary designer in the art"); *In re Chung*, No. 00-1148, 2000 WL 1476861, at *3 (Fed. Cir. Oct. 4, 2000) (two small depressions in the design of a cigarette package were de minimis changes); *In re Cooper*, 480 F.2d 900, 901-02 (CCPA 1973) (affirming Board's conclusion that numerous changes to the design of a prior art building—including a single rather than double door and the addition of windows—were de minimis because the overall impression was still a building that looked like a barrel).

Here, the Eagles jersey had already disclosed the use of ornamental surge stitching. The only additional step needed was to extend the stitching down the sides of the rear of the jersey. Moreover, the V2 jersey plainly suggested the addition of vertical lines down the rear of the jersey through the use of the seams between the two types of fabric. We agree with the district court that adding ornamental surge stitching on top of a preexisting seam was an insubstantial change that would have been obvious to a skilled designer.[6]

---

reasonable fact-finder could find in MRC's favor on this issue. *See supra* at 14.

[6]    To be clear, we do not intend to suggest that merely because one prior art reference used ornamental surge stitching, *any* use of such stitching would have been a de minimis change. Rather, the addition of the surge stitch-

## C.  Secondary Considerations

In support of the non-obviousness of its patents, MRC submitted evidence relating to commercial success, copying, and acceptance by others.  First, with respect to commercial success, MRC argued that the sales of the V3 jersey (which embodied the patented design) were more successful than sales of the V2 design it replaced.  Second, MRC alleged that Hunter and CDI chose to copy the patented V3 design rather than other available non-patented designs.  And third, MRC points out that it has granted a license on the '488 patent.

The district court noted that the only evidence in support of these secondary considerations was the testimony of the inventor himself, which was "unpersuasive to demonstrate a genuine dispute" of fact sufficient to defeat summary judgment of obviousness.  *MRC*, 921 F. Supp. 2d at 810.  MRC argues that in so doing, the district court effectively dismissed the uncontroverted secondary considerations evidence as if it did not exist, rather than construing the evidence in the favor of the non-moving party—in this case, MRC.  MRC also points out that Hunter and CDI failed to provide any evidence of another explanation for those secondary considerations besides a nexus with the claimed design.

Here, however, MRC has the standard backwards.  As the patentee, it was MRC's burden of production to demonstrate a nexus between the claimed design and the secondary considerations.  *See Crocs*, 598 F.3d at 1311.  MRC presented no evidence whatsoever that the commercial success and copying were related to the merits of the

---

ing in this case was de minimis because it merely followed the visual lines created by the seams of the V2 jersey; in other words, it served only to highlight a design feature that had already existed in the V2 prior art jersey.

claimed invention. Merely stating—with no supporting figures or data—that the V3 was more successful than the V2 is insufficient on its own to establish that the V3 has been a "commercial success" and that its success was attributable to the claimed design features. Moreover, the only license MRC produced was between MRC and FiG, a company that is at least partially owned by Mark Cohen, who also owns MRC.

Thus, although the district court's analysis of secondary considerations was admittedly somewhat cursory, we do not believe that the evidence of record before the district court created a genuine dispute of *material* fact; to the contrary, even construing the evidence in the light most favorable to MRC, MRC had not established a nexus between the secondary considerations and the claimed design that was sufficient to overcome the other evidence of obviousness.

Because we affirm the invalidity of the '488 patent on obviousness grounds, we need not reach Hunter's alternative argument that the patent is invalid under 35 U.S.C. § 112. Nor would it be appropriate for us to do so, as a denial of a motion for summary judgment is not a final appealable decision. *See Lermer Ger. GmbH v. Lermer Corp.*, 94 F.3d 1575, 1576 (Fed. Cir. 1996) ("The final judgment rule prohibits a party from appealing a district court's denial of a motion for summary judgment.").

## II. The '487 Patent

A similar analysis applies to the '487 patent. The district court also found the '487 patent obvious, relying on the baseball version of the Sporty K9 jersey as the "primary reference," and the V2 and Eagles football jerseys as the secondary references. *MRC*, 921 F. Supp. 2d at 811-12. A side-by-side comparison of the '487 design

and the Sporty K9 baseball jersey is depicted below:

| '487 Patent | Sporty K9 Baseball Jersey |
|---|---|
| | |

MRC again argues that there are several major differences between the Sporty K9 baseball jersey and the design claimed in the '487 patent, and that the district court erred by failing to translate the patented design into a verbal description and instead focusing only on high-level similarities between the two designs.

As with the '488 patent, although the district court did not expressly undertake to translate the patented design by itself, a description can easily be seen from the court's discussion of the similarities and differences between the Sporty K9 baseball jersey and the patented design. Specifically, the court noted that the patented design has a V-shaped collar, two openings for sleeves with cuffs for the front limbs, a banded opening at the bottom for the hind portion of the pet, and four buttons extending vertically down the front of the jersey. *Id.* at

811. In pointing out the differences between the two designs, the court noted that the patented design contains a mesh fabric not found in the Sporty K9 jersey, that it is less "tubular" in shape than the Sporty K9 jersey, and that it lacks the "faux t-shirt" collar portion of the Sporty K9 jersey. *Id.* at 811-12. Thus, the district court sufficiently described the patented design so as to "evoke a visual image consonant with the claimed design." *Durling*, 101 F.3d at 104.

Moreover, we agree with the district court that the overall visual impression of the Sporty K9 baseball jersey is "basically the same" as the '487 patented design. Indeed, of the several minor differences the district court pointed out between the two products, only the less tubular shape of the '487 design truly affects the overall visual impression of the design as a whole. As to that difference, Hunter provided evidence that the Sporty K9 jersey more closely resembles the patented design when actually worn by a pet, rather than when depicted in plan view; an image from the Sporty K9 brochure reveals that a garment (there, a dog sports jacket) which appears quite tubular in plan view (just like the Sporty K9 baseball jersey) actually appears much shorter in the front when worn by a dog. J.A. 160. Thus, the Sporty K9 baseball jersey can reasonably be considered a "primary reference" for purposes of the obviousness analysis.

Additionally, once the Sporty K9 baseball jersey is identified as the primary reference, the secondary references would easily have led an ordinary designer to make the claimed design. The district court relied on both the V2 and Eagles football jerseys to demonstrate that the use of mesh and a less "tubular" shape were well known in the prior art for pet jerseys. *MRC*, 921 F. Supp. 2d at 812. For the same reasons as discussed above, we have no trouble concluding that those jerseys are "so related" to the claimed design that the mere similarity in visual

appearance would suggest the combination of those features to create the claimed design.

We therefore affirm the district court's grant of summary judgment of invalidity of the '487 patent.

**AFFIRMED**