An appropriate order will enter.

**MALIBU BOATS, LLC, Plaintiff,**

v.

**NAUTIQUE BOAT COMPANY, INC., Defendant.**

**No. 3:13–CV–656–TAV–HBG.**

United States District Court, E.D. Tennessee, at Knoxville.

Filed Jan. 28, 2015.

Benjamin B. Anger, Douglas G. Muehl-hauser, Hans Mayer, Ioanna S. Bouris, Laura E. Hall, Mark Lezama Knobbe, Martens, Olson & Bear, LLP, Irvine, CA, John P. Konvalinka, Thomas Martin Gautreaux, Grant, Konvalinka & Harrison, PC, Chattanooga, TN, for Plaintiff.

Brian R. Gilchrist, Ryan T. Santurri, Allen, Dyer, Doppelt, Milbrath & Gilchrist, P.A., Orlando, FL, J. Keith Coates, Jr., J. Ford Little, Woolf, McClane, Bright, Allen & Carpenter, PLLC, Knoxville, TN, for Defendant.

### MEMORANDUM OPINION AND ORDER

THOMAS A. VARLAN, Chief Judge.

This civil action is before the Court on ten motions by the parties, including de-fendant's motion to reconsider staying the case, defendant's three motions for claim interpretation, the parties' motions for summary judgment of infringement and noninfringement, and the parties' motions for summary judgment of invalidity and no invalidity. The Court held a hearing on the pending motions on December 16, 2014, during which the Court heard oral argument from the parties.

### I. Background [1]

This dispute involves several patents for technology intended to modify the wake of a recreational boat to make the wake suitable for surfing, whereby a person trails the boat and uses a board to surf the boat's wake [Doc. 42 p. 1]. Plaintiff, a boat manufacturer headquartered in Tennessee, holds three patents for the technology and method used to implement the technology: U.S. Patent No. 8,534,214, issued September 17, 2013, U.S. Patent No. 8,539,897, issued September 24, 2013, and U.S. Patent No. 8,578,873, issued November 12, 2013 [Id. at 1–2]. The Court will refer to each patent, as the parties do, by the last three digits of the patent number—'214, '897, or '873.

The '214 patent depicts pivoting fins along the centerline of the boat, while the '897 and '873 patents depict tabs attached to the boat's transom [Compare Doc. 25–2, with Docs. 25–1, 25–3]. In June 2012, the latter system was released as "Surf Gate" [Doc. 42 p. 3]. Surf Gate is a mechanical system that changes the shape and direction of a boat's wake, using installed structures known as "water diverters" at the boat's stern [Id. at 2].[2] Installing these water diverters, and allowing the boat's

---

1. Although the Court discusses certain facts relevant to the Court's analysis, the Court presumes familiarity with the facts of this case as well as the analysis underlying the Court's previous memorandum opinions [Docs. 42, 70].

2. Throughout their filings and during the hearings on this matter, the parties have used

driver to control them from the helm of the boat, enables the boat's wake to be manipulated based on water conditions or the wake surfer's preferences [*Id.*].

With Surf Gate, the boat's driver can create a surfable wake at the touch of a button and transfer the wake from one side to the other [*Id.* at 3]. Passengers may sit anywhere on the boat as there is no need for uneven weight distribution [*Id.*]. Plaintiff asserts that Surf Gate, upon its release into the market as a $3,000 option, was purchased by everyone who purchased a Malibu Wakesetter boat [*Id.*].

In early 2013, defendant Nautique, a Florida boat manufacturer that directly competes with plaintiff around the country, announced its Nautique Surf System, a system similar to Surf Gate that allows for wake modification [*Id.*]. In describing its system, defendant contends that unlike plaintiff's and other competitors' systems, the Nautique Surf System uses interceptors that deploy directly into the flow of water, rather than tabs that extend at an angle away from the flow of water [*Id.*].

On September 17, 2013, the day the '214 patent was issued, plaintiff filed an infringement action in the United States District Court for the Central District of California [*Id.* at 4]. Plaintiff voluntarily dismissed the case on October 31, 2013, and filed the present action in this Court on the same day [*Id.*]. On November 1, 2013, defendant filed a declaratory action in the United States District Court for the Middle District of Florida, seeking a declaratory judgment of noninfringement or invalidity as to plaintiff's patents [*Id.*]. This Court later issued an order granting plaintiff's motion to enjoin the later-filed Florida action and denying defendant's request to transfer this case to the Middle District of Florida [*Id.* at 4 n. 3].

Soon after filing its complaint, plaintiff moved for preliminary injunctive relief as to the '897 patent only [Doc. 70 p. 2]. After extensive briefing by the parties and a hearing on January 6, 2014, the Court denied the motion in a memorandum opinion and order entered February 4, 2014 [*Id.*]. The Court analyzed, among other issues, the meaning of the patents' terms "side strake," "substantially perpendicular," and "surf wake" [Doc. 42 p. 10–20]. The Court found that "side strake" means the exterior side surface of the hull and that "substantially perpendicular" means approximately perpendicular [*Id.* at 10–18]. Rejecting Nautique's argument that the term "surf wake" is indefinite, the Court construed the term as a wake created by the extension of a water diverter which is substantially smoother, larger, and with a higher peak than a non-enhanced wake [*Id.* at 18–20]. In assessing the validity of the '897 patent, the Court found that Nautique had raised a question of validity in light of an existing patent named Svensson but that Malibu would likely overcome that challenge as to certain claims [*Id.* at 24–26]. Although the Court found that Malibu would likely succeed on the merits of its patent infringement claim, the Court denied the injunction based on the lack of irreparable harm [*Id.* at 22, 37–38].

A few months later, on June 27, 2014, defendant filed its petition for *inter partes* review with the Patent Trial and Appeal Board ("PTAB") of the United States Patent and Trademark Office pursuant to 35 U.S.C. § 311, asserting that the '897 patent's claims are unpatentable because of prior art [Doc. 70 p. 2]. Defendant requested a stay of this patent infringement litigation pending resolution of its petition to PTAB [*Id.* at 1]. On August 6, 2014, the

---

the term "water diverter" interchangeably with the terms "tabs," "interceptors," and "flaps."

Court denied the motion, reasoning, in part, that while the *inter partes* review process "has some potential to clarify some of the issues in this case, ... that potential is speculative at best until the petition is granted" [*Id.* at 8].

Then, on November 26, 2014, the PTAB issued a decision granting *inter partes* review of certain claims of Malibu's '897 patent [Doc. 150–1]. The PTAB analyzed the terms "surf wake" and "substantially perpendicular" and found a reasonable likelihood that Nautique would prevail on its assertion that Claims 1–5, 8–11, 13–16, and 18–20 of Malibu's '897 patent are anticipated by Svensson—an existing patent for a system that operates similarly to the systems at issue in this case [*Id.* at 9–10, 12–14, 23]. In light of the PTAB's decision, Nautique asks the Court to reconsider staying this litigation pending a final determination by the PTAB [Doc. 150].

## II. Motion to Stay

The decision to stay litigation lies within the discretion of the district court, representing its power to control the disposition of cases on its docket. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936). But " 'a court must tread carefully in granting a stay of proceedings, since a party has a right to a determination of its rights and liabilities without undue delay.' " *Procter & Gamble Co. v. Team Techs., Inc.*, No. 1:12–cv–552, 2013 WL 4830950, at *1 (S.D.Ohio Sept. 10, 2013) (quoting *Ohio Envtl. Council v. U.S. Dist. Court*, 565 F.2d 393, 396 (6th Cir.1977)).

In the context of patent reexamination proceedings, courts generally weigh three factors: (1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay would simplify the issues in question and trial of the case; and (3) the stage of the proceedings, including whether discovery is complete and whether a trial date has been set. *Id.* at *2; *see, e.g., Radio Sys. Corp. v. E. Mishan & Sons, Inc.*, 3:13–cv–383, 2014 WL 1870775, at *1 (E.D.Tenn. Mar. 28, 2014). These factors, however, are not controlling, and a court's decision whether to grant a stay pending *inter partes* review should be based upon the totality of the circumstances. *See Universal Elecs. Inc. v. Universal Remote Control, Inc.*, 943 F.Supp.2d 1028, 1031, 1035 (C.D.Cal.2013).[3] Under 35 U.S.C. § 316(a)(11), the final determination in an *inter partes* review generally must be issued not later than one year after the date review was instituted. The PTAB's decision, however, may be appealed to the Court of Appeals for the Federal Circuit. 35 U.S.C. §§ 319, 141(c).

Nautique addresses the factors in turn [Doc. 150 p. 3–4]. First, Nautique argues that a stay will save Malibu money and will eliminate the possibility of inconsistent decisions, a new trial, post-trial disputes, or resolution by the Federal Circuit [*Id.* at 3]. Second, Nautique argues that the potential for simplification of issues is much greater than when the Court considered defendant's previous motion to stay [*See id.*]. In denying the previous motion to stay, the Court expressed concern that because Nautique's petition for *inter partes* review had not been granted, arguments about simplification were speculative [Doc. 70 p. 8]. Nautique argues that concern is alleviated and cites a study that has found that *inter partes* review proceedings invalidate all claims before it 77.5% of the time [Doc. 150 p. 3]. Although the proceedings only

---

3. Although *inter partes* review is a new means to challenge patent validity, the same general principles that governed stays pending the old *inter partes* reexamination process apply with equal force to stays pending the new *inter partes* review. *CANVS Corp. v. United States*, 118 Fed.Cl. 587, 591 n. 5 (2014).

directly impact the '897 patent, Nautique contends that a more conclusive interpretation of "surf wake" would significantly simplify the issues pending before this Court [*See id.* at 3–4].

In the Court's opinion entered August 6, 2014, denying defendant's previous request for a stay, the Court highlighted the prejudice that a stay works on direct competitors, especially in a narrow market [Doc. 70 p. 5]. The Court also noted that the review proceeding involves only one of the three patents at issue and that the Court has devoted considerable time and resources to familiarizing itself with the facts and relevant law [*Id.* p. 8–9]. Not including the length of an appeal, the review process could last another ten months, and an additional six months if an extension is granted [*Id.* p. 6; 35 U.S.C. § 316(a)(11)].

As the Court previously noted, any simplification of the issues before the Court would be limited because the *inter partes* review will address only one of the three patents. And the review cannot entirely eliminate the '897 patent, as PTAB is not reviewing Claim 12 [*See* Doc. 150–1 p. 14, 23; *see also Procter & Gamble Co. v. Team Techs., Inc.,* No. 1:12–cv–552, 2014 WL 533494, at *4 (S.D.Ohio Feb. 11, 2014) (denying a motion to stay and noting that "in addition to the 11 claims that Plaintiff has asserted in this case that are also at issue in the [*inter partes* review proceedings], the remaining 16 asserted claims are *not* at issue in any [*inter partes* review]")]. These facts support denying a stay, as do the close of discovery and the impending trial date in this case. Finally, the persuasiveness of PTAB's final decision regarding invalidity may be limited because the Board adopted a significantly different definition of "surf wake," there is

no presumption of validity in reexamination proceedings, and PTAB employs a preponderance, rather than civil litigation's clear and convincing, evidence standard. *See In re Baxter Int'l, Inc.,* 678 F.3d 1357, 1364 (Fed.Cir.2012) ("[T]he PTO in reexamination proceedings and the court system in patent infringement actions take different approaches in determining validity and on the same evidence could quite correctly come to different conclusions." (internal quotation marks and citation omitted)). Nor would this Court owe any deference to the PTAB's claim construction. *See, e.g., Pragmatus AV, LLC v. Yahoo! Inc.,* No. C–13–1176 EMC, 2014 WL 1922081, at *4 (N.D.Cal. May 13, 2014).

In sum, this case is much farther along than it was when Nautique originally sought a stay, and the potential for simplification of the issues before the Court is not so great as to outweigh the prejudice that would result from a stay. Because the totality of the circumstances weighs against a stay, Nautique's renewed request for a stay will be denied.

### III. Dispositive Motions

Aside from Nautique's motion to reconsider a stay, the parties have filed multiple dispositive motions. Plaintiff Malibu has moved for partial summary judgment of infringement, asking for a ruling that Nautique has literally infringed Claims 1, 5, 16, 18, 19, and 20 of the '897 patent and Claims 20, 22, 27, and 28 of the '873 patent [Doc. 51]. Defendant Nautique has responded with motions for summary judgment of noninfringement [Doc. 93] and of invalidity [Doc. 95], because invalid patent claims cannot give rise to liability for infringement.[4] Malibu, in turn, has filed a

---

4. Defendant has also filed motions for claim interpretation of Malibu's patents [Docs. 75, 76, 77]. These motions, and Malibu's responses thereto, overlap significantly with the parties' summary judgment motions and have assisted the Court in deciding the summary judgment motions.

motion for summary judgment of no invalidity based on the Svensson patent [Doc. 91].

## A. Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir.2002).

To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249, 106 S.Ct. 2505. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v.*

*J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

■ The two elements of a patent infringement case are (1) construing the patent and (2) determining whether infringement occurred. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The first is a question of law, to be determined by the Court, and the second is a question of fact, to be submitted to a jury. *Id.*; *Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351, 1358 (Fed.Cir.2012) ("In infringement cases, the court first interprets the claims to determine their scope and meaning. Next the jury compares the properly construed claims to the allegedly infringing device."). Malibu asserts that Nautique rests its non-infringement case on erroneous interpretations of the following claim terms: "side strake," "substantially perpendicular," "upright," and "surf wake" [Doc. 56 p. 19–20]. According to Malibu, when these terms are properly construed, each Nautique boat equipped with the Nautique Surf System is infringing because it satisfies every limitation of the ten claims mentioned in Malibu's motion for summary judgment [*Id.* at 19]. The Court, therefore, will provide a brief background of the claims and the standard for claim construction, construe the claim terms at issue, and then determine, based on its constructions of the terms, whether Nautique is infringing or not infringing as a matter of law. Subsequently, the Court will address the parties' arguments regarding the patents' validity.

### B. Claim Construction

▌ As the Court explained in its preliminary injunction opinion, when the meaning of a claim term as understood by persons of skill in the art is not immediately apparent, courts look to " 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.' " *Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed.Cir.2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1116 (Fed.Cir. 2004)). Such sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (citation omitted). As part of "a fully integrated written instrument," however, the specifications are usually "the single best guide to the meaning of a disputed term." *Id.* at 1315 (citations omitted); *see also Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1478 (Fed.Cir.1998) ("The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history."); *Phillips,* 415 F.3d at 1317 ("[W]hile extrinsic evidence 'can shed useful light on the relevant art,' . . . it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.' " (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858, 862 (Fed.Cir.2004))). Finally, the Court understands that it is not bound by its previous interpretations of the claim terms at the preliminary injunction stage. *See Jack Guttman, Inc. v. Kopykake Enters., Inc.,* 302 F.3d 1352, 1361 (Fed.Cir. 2002) (stating that district courts "may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves").

The '897 and '873 patents are similar [*Compare* Doc. 25–1 ("'897 patent"), *with* Doc. 25–3 ("'873 patent")]. While the Court will not quote each claim in full, a recitation of Independent Claim 1 of the '897 patent will be helpful to understanding the Court's analysis. The terms disputed by the parties are italicized.

1. A boat configured to modify its wake for surfing, the boat comprising:

A hull comprising port and starboard *side strakes,* a bottom, a transom aft said side strakes, and a longitudinal axis, wherein when said hull moves through water, water flows along the port and starboard side strakes and then beyond the transom to at least in part form a first wake; starboard and port *upright* water diverters each movable between a first position and a second position, said second position of said starboard water diverter laterally extending beyond said starboard side strake at the transom *substantially perpendicular* to said longitudinal axis of the hull, and said second position of said port water diverter laterally extending beyond said port side strake at the transom substantially perpendicular to said longitudinal axis of the hull, wherein when said hull moves through water, said starboard diverter in said second position redirects water passing along said starboard side strake as said water moves beyond said transom to produce a port side *surf wake* different from said first wake and wherein when said hull moves through water, said port diverter in said second position redirects water passing along said port side strake as said water moves beyond said transom to produce a starboard side surf wake different from said first wake and different from said port side surf wake.

['897 patent, col. 14, ll. 26–51].

Dependent Claim 5 adds that "the starboard and port side water diverters are

each movable to one or more interim positions" [*Id.*, col. 14, ll. 65–67]. Independent Claim 16 includes many of the same elements as Independent Claim 1 but adds that the laterally-extendable water diverters are "laterally retractable behind said transom, said extension and said retraction capable of occurring while said surf boat moves through water" [*Id.*, col. 16, ll. 21–31]. And Dependent Claim 20 adds that the diverters retract automatically when the boat travels above a predetermined speed [*Id.*, col. 16, ll. 45–47]. The claims at issue in the '873 patent are similar, but Independent Claim 27 recites, instead of "surf wake," the terms "asymmetrical wake" and "non-surf wake" ['873 patent, col. 26–27, ll. 61–2].

### 1. Side Strake

Of the claims at issue in Malibu's motion for summary judgment of infringement, all claims of the '897 patent and Dependent Claim 22 of the '873 patent include the term "side strake." Like at the preliminary injunction stage, Nautique relies on extrinsic evidence and argues that strakes are "ridges or raised surfaces attached to or molded into the surface of the hull" [Doc. 93 p. 5; Doc. 42 p. 10]. The Court previously rejected these arguments in the context of the '897 patent [*see* Doc. 42 p. 10–13] and will do so again in the context of both the '897 and '873 patents. However, having further reviewed the specifications and relevant prosecution history [*see* Doc. 42 p. 12], and the parties' additional arguments, the Court will modify its preliminary construction and define the term "side strake" as an exterior side surface of the hull, at least a significant part of which is adjacent to the water diverter at the transom and is therefore underneath the water surface when the boat travels through water [*See, e.g.*, '897 patent, col. 14, ll. 30–31 (stating that "when said hull moves through water, water flows along the port and starboard side strakes"); *id.*, col. 14, ll. 43–44 (stating

that when a water diverter is deployed, it "redirects water passing along the said starboard side strake"); '873 patent, col. 7, ll. 48–52 (stating that extending the diverter beyond the side strake will "redirect and/or deflect water passing along the water craft") ].

The Court's final construction diminishes Nautique's argument that the Court's preliminary construction—"the exterior side surface" of the hull—equates the meanings of "side strake" and "side of the hull" [*See* Doc. 75 p. 21]. And even if a side strake were to encompass the whole exterior side surface on a certain boat, the Court does not believe its construction would render any claim term superfluous. While the meanings of "side strake" and "side of the hull" undoubtedly overlap to a degree, "side of the hull" does not appear in any of the claims of either the '897 or '873 patents and therefore does not appear to be subject to this principle of construction [*See* '897 patent, cols. 14–16; '873 patent, cols. 24–27; *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed.Cir.2005) ("A claim construction that gives meaning to *all the terms of the claim* is preferred over one that does not do so.") (emphasis added) ]. In other words, because "side of the hull" is not a claim term, interpreting "side of the hull" and "side strake" similarly does not render superfluous any term within the patents' claims.

The '897 and '873 patents describe edge 40$p$ in Figure 3 (shown below) as "the intersection of the transom with the port side strake" and edge 40$s$ as "the intersection of the transom with the starboard side strake" ['897 patent, col. 5, ll. 29–36; '873 patent, col. 6, ll. 37–44]. Figure 3 of the patent's grandparent application, which the '897 and '873 patents incorporate by reference [*E.g.*, '873 patent, col. 1, ll. 10–12, 20–22], specifically identifies the port and starboard side strakes with reference

numerals 44p and 44s [Doc. 56 p. 21]. Malibu explains that the side strake, as illustrated in Figure 3, "may make up sub- stantially the entire side of the hull" [Doc. 98 p. 17].

**FIG. 3**

.Another example of a side strake can be found in Figure 1 of the '897 and '873 patents. The back edge of starboard side strake 44s is visible and labeled in that figure [See, e.g., '873 patent, col. 6, ll. 39 (demonstrating that references to 44s rep- resent the starboard side strake)]. Mali- bu explains that, as illustrated in Figure 1, the side strake "may be a relatively small surface on the side of the hull" [Doc. 98 p. 12].

**FIG. 1**

The specifications include many other references to the term "side strake." For example, Claim 1 of the '897 patent states that when the starboard water diverter is moved from first to second position, the diverter "laterally extend[s] beyond said starboard side strake at the transom" ['897 patent, col. 14, ll. 35–40]. The specifications confirm that the objective of the lateral extension beyond the side strake is for the diverter to extend into the flow of water and redirect water as it moves past the transom [See, e.g., '897 patent, col. 6, ll. 40–45 ("[T]he system may be configured to allow the flap to laterally extend beyond the side strake ... in order to redirect and/or deflect water passing along the water craft as it moves beyond the transom.")]. Because the specifications make clear that water flows along the boat's side strakes as the boat travels and that the water diverters extend beyond the strakes

to divert water, the Court finds that at least a significant part of the side strake (an exterior side surface) must be submerged and adjacent to the water diverters [See, e.g., '897 patent, col. 2, ll. 26–29 (stating that the water diverter "may extend outboard beyond a side strake of the watercraft to deflect water traveling along the side strake and past the transom")].

Anticipating such a claim construction, Nautique argues that its system does not infringe because its water diverters do not extend "beyond the exterior side surfaces higher up the boat sides," parts of the boat that Malibu has identified, through Figure 3, as being strakes [Doc. 93 p. 7–10 (citing diagrams of its boats)]. The Court's construction of "side strake" could also encompass such a surface higher up a boat's side. In the diagram of the Nautique G23 model shown below, Nautique uses vertical lines on both sides to demonstrate that its

water-diverting plate-like structures extend beyond only part of the exterior side surface (i.e., extend to the first vertical line but not the second).

## G23

Nautique continues, "The claims do not suggest the water diverter need only extend beyond a *portion* of the strakes or the narrowest portion of the strakes" [*Id.* at 10 (emphasis in original)]. Malibu responds that, under its patents, the water diverters need only extend beyond the side strakes "at the transom," for the purpose of "redirect[ing] water passing along [the] side strake as said water moves beyond said transom" [Doc. 98 p. 13 (quoting Claim 1 of the '897 patent, col. 14, ll. 36–51)]. At the December 16, 2014, hearing, Malibu noted that "Nautique's position requires construing 'extending beyond' [the] side strake to mean 'extending beyond [the] widest point of the transom'" [*See* Doc. 177]. Nautique appears to try to frame the issue as whether its products are infringing, i.e., the factual question of "whether the construed claim reads on the accused product." *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed.Cir.1998).

The Court finds, however, that this is in essence a battle over the scope of the claim terms "extending beyond" and "extendable beyond" and will address this issue as part of its claim construction. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed.Cir.1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement."); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360–63 (Fed.Cir.2008) (holding, when parties agreed that "only if" had a common meaning but disputed whether the "only if" limitation allowed for exceptions, that the court should have adjudicated the parties' dispute during claim construction rather than allow the parties to argue the scope of the claim—the meaning and legal significance of the "only if" limitation—to the jury).

Having reviewed the intrinsic evidence, the Court finds that the claims require extension beyond the side strake only where the side strake is submerged and adjacent to the water diverter. *See O2*

*Micro,* 521 F.3d at 1360 ("Words of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention."); *see also Source Vagabond Sys. Ltd. v. Hydrapak, Inc.,* 753 F.3d 1291, 1301 (Fed.Cir. 2014) (" 'To be clear, it is the purpose of the *limitation* in the claimed invention— not the purpose of the invention itself— that is relevant.' " (quoting *Cohesive Techs., Inc. v. Waters Corp.,* 543 F.3d 1351, 1368 (Fed.Cir.2008))). The claims mention extension "at the transom," which supports that the part of the side strake adjacent to the water diverter is the relevant part of the side strake for assessing "extending beyond." Similarly, the purpose of the "extending beyond" limitation supports the Court's construction. Whether the transom widens above the water diverter does not affect the diverter's ability to redirect water passing along the submerged portion of the side strake. In sum, defendant has not shown, and the specifications do not appear to support, that Malibu's claims should be limited to extensions of a certain distance beyond the side strake.

### 2. Substantially Perpendicular

Independent Claims 1 and 16 of the '897 patent and Dependent Claim 22 of the '873 patent recite that each water diverter is laterally extendable beyond a side strake at the transom and that this lateral extension is "substantially perpendicular" to the hull's longitudinal axis. As the Court previously noted, Federal Circuit precedent counsels that "substantially" is a descriptive term of approximation commonly used in patent claims to avoid a strict numerical boundary [Doc. 42 p. 14]. Absent intrinsic evidence to the contrary, "substantially" is generally given its ordinary meaning [*Id.* (citing cases) ]. After reviewing the '897 patent and the prosecution history, the Court gave the term substantially its ordi-

nary meaning and defined "substantially perpendicular" to mean approximately perpendicular [*Id.* at 18].

Malibu asks the Court to reaffirm its prior interpretation, reasoning that the term allows for reasonable deviations from exactly perpendicular [*E.g.,* Doc. 56 p. 22– 23]. The PTAB, in its decision granting *inter partes* review, agreed with Malibu and the Court's preliminary construction and construed the term as approximately perpendicular [Doc. 150–1 p. 7, 9–10 (applying the "broadest reasonable interpretation standard," where "claim terms are given their ordinary and customary meaning in view of the specification, as would be understood by one of ordinary skill in the art at the time of the invention") ]. Nautique now argues that "substantially perpendicular" means "about ninety degrees, as measured by degrees" and argues that Malibu is improperly describing this limitation in inches [Doc. 75 p. 15–16, 23–24; Doc. 76 p. 24; *see also* Doc. 51–8 (stating in response to Malibu's interrogatories that "substantially perpendicular" means "within 5° of perpendicular") ].

While the specifications note that "the surf wake system may be configured to hold the flaps at 0°, 5°, 10°, 15°, 20°, 25°, 30° and etc. relative to the centerline" ['897 patent, col. 6, ll. 56–58], the Court is not convinced that angle measurement is the only proper context in which to analyze "substantially perpendicular." The specifications do not use angle measurements or measurements in degrees when stating that "the system may be configured to allow the flap to laterally extend beyond the side strake substantially perpendicular to the longitudinal axis of the watercraft" [*E.g.,* '897 patent col. 6, ll. 40–43]. And both patents explain that "the flap need not be planar .... Other suitable configurations and sizes can be employed, including curved surfaces, curved edges, differ-

ent geometric profiles" ['897 patent, col. 7, ll. 53–58; '873 patent, col. 8, ll. 61–66]. Viewing "substantially perpendicular" solely in terms of angles would wrongly limit the claims to water diverters that have a well-defined angle relative to the longitudinal axis. Therefore, having reviewed the specifications and the parties' arguments, the Court reaffirms its construction of "substantially perpendicular" as approximately perpendicular.

### 3. Upright

All of the claims at issue in Malibu's motion for summary judgment of infringement require "upright" water diverters or "upright" wake modifiers. The Court did not address the meaning of "upright" at the preliminary injunction stage. Relying on the specifications, Malibu argues that "upright" means "oriented generally vertically with respect to the boat, allowing for slight inclination" [Doc. 56 p. 26]. Nautique contends that "upright" should be construed as "vertical" [See e.g., Doc. 82 p. 17].

The figures in the '897 and '873 patents show water diverters that are upright even though they are slightly inclined [See Figures 1–3, 10]. The incline of each water diverter is determined by its pivot axis. In Figure 3, the pivot axis is parallel to the boat's side edge, which angles inwards slightly [See '897 patent, col. 5, ll. 47–57; '873 col. 6, ll. 55–65]. In addition to this already inclined orientation, the patents explain that the pivot axis may incline even further, including by at least 15° more [See '897 patent, col. 5, ll. 47–57 (stating that the pivot axis need not be parallel to the corresponding side edge and "may be substantially vertical, substantially parallel to the side edge, some other angle therebetween, or some angle slightly inclined with respect to the side edge"); '873 patent, col. 6, ll. 55–65 (same)]. Because construing "upright" as "vertical" would exclude the disclosed embodiments with slightly in-

clined diverters, the Court will not adopt Nautique's proposed definition. See Broadcom Corp. v. Emulex Corp., 732 F.3d 1325, 1333 (Fed.Cir.2013) (stating that an interpretation that excludes a disclosed embodiment from the scope of the claim is rarely, if ever, correct).

During prosecution, Malibu distinguished its invention from another by claiming that "a propeller is not an upright or substantially vertical water diverter" [Doc. 76 p. 16 (citing Doc. 76–6 p. 18) ]. Nautique argues that Malibu chose "upright" rather than "substantially vertical" and "cannot now change the terms chosen" [Id.; see also Doc. 143 p. 6 (noting that Malibu's '214 patent claimed "wake modifiers oriented substantially vertically") ]. The Court finds, however, that Malibu's use of the terms synonymously supports that the term upright allows for slight inclination.

This conclusion is bolstered by the term's ordinary meaning. See Phillips, 415 F.3d at 1322 (demonstrating that courts may look to dictionaries during claim construction as they "are often useful to assist in understanding the commonly understood meanings of words"). Nautique has pointed the Court to an internet dictionary that defines upright as "erect or vertical." Upright Definition, Dictionary.com, http://dictionary.reference.com/browse/upright?s=t (last visited Jan. 27, 2015) ]. However, the second definition listed for "upright" is "raised or directed vertically upward." Id. And unlike vertical, which that dictionary defines as "being in a position or direction perpendicular to the plane of the horizon; upright," Vertical Definition, Dictionary.com, http://dictionary.reference.com/browse/vertical?s=t (last visited Jan. 27, 2015), that dictionary defines erect as simply "upright in position or posture," Erect Definition, Dictionary.com, http://dictionary.reference.

com/browse/erect?s=t (last visited Jan. 27, 2015). Taking the dictionary definitions as a whole, the Court finds that they support that the term "upright" allows for slight inclination. In any event, the dictionary definition cited by Nautique does not overcome the intrinsic evidence.

Finally, Nautique argues that Malibu's system is a hinged flap system that is completely different than Nautique's, which does not have a hinged flap or anything similar [Doc. 76 p. 16; Doc. 82 p. 17]. But patent claims are not construed with reference to the accused product. *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1330 (Fed.Cir.2006). While there are obvious differences between Nautique's and Malibu's systems, Malibu's patents encompass diverters that do not pivot [*Compare* '873 patent, col. 25, ll. 4–9 (disclosing, in an independent claim, upright water diverters movable between a first and second position), *with* '873 patent, col. 25, ll. 49–50; *id.*, col. 26, 48–51 (disclosing, in dependent claims, diverters that pivot) ].

■■■ Having considered the evidence and the parties' arguments, the Court agrees with Malibu's construction and construes "upright" to mean oriented gen-

erally vertically with respect to the boat, allowing for slight inclination.[56] *See O2 Micro*, 521 F.3d at 1361 ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.").

### 4. Surf Wake

The surf wake limitation is found in Claims 1, 5, and 19 of the '897 patent and Claims 20 and 22 of the '873 patent, while the term "non-surf wake" is found in Claims 27 and 28 of the '873 patent. Before attempting to define what a surf wake is, the Court finds it helpful to understand how a surf wake is created. Figure 13 of the patents is particularly instructive. When a boat is travelling through water, water flows along both sides of the boat [*See* '897 patent, col. 4, ll. 39–41 (stating that the invention "is concerned with flow management of water passing the stern as the water craft is moving forward through a body of water") ]. Figure 13A demonstrates that when the water flowing along both sides of the boat is unimpeded (i.e., neither water diverter deployed), the two water flows converge at their natural in-

---

**5.** The Court rejects Nautique's argument involving the Moore patent [Doc. 143 p. 6–7]. During prosecution, Malibu argued that the Moore patent, in the context of a figure showing Moore's diverters in a deployed position, "fails to teach or suggest upright water diverters" [Doc. 76–2 p. 80]. Nautique argues that Malibu's statement is a disclaimer of generally vertical but inclined diverters [Doc. 143 p. 6–7]. This argument fails because Nautique has considered Malibu's statement in the context of a different figure from the Moore patent, a figure showing Moore's diverters in the inactive position, in which they are "substantially vertical" but have "a slight incline" [*Id.* at 7].

**6.** The Court also rejects Nautique's argument that whether a diverter is "upright" should be

evaluated when the boat is in motion and the bow angle is raised an additional 6°–10° [Doc. 82 p. 18; Doc. 93 p. 11]. Combining the static incline of its products with the additional incline caused by a boat traveling, Nautique's water diverters would incline from 7°–18°, which Nautique argues would not be considered "upright" to one of ordinary skill in the art [Doc. 93 p. 11]. Nautique does not cite anything in the intrinsic or extrinsic record to support evaluating uprightness relative to the surface of the water. The intrinsic record does, however, describe the orientation of the diverters relative to the structure of the boat [*See* '897 patent, col. 5, ll. 47–57 (describing the orientation of the pivot axis, and therefore the water diverter, "with respect to the side edge" of the boat) ].

tersection behind the boat and a conventional wake forms. When a starboard side surf wake is desired, the port diverter is deployed, which disrupts the flow of water along the port side "such that the flow of water is redirected outwardly and/or rearwardly thereby delaying convergence of the port side flow with starboard side flow" behind the boat "to form a larger starboard wake with a higher peak and smoother face that is suitable for starboard surfing" ['897 patent, col. 11–12, 66–7; *see also* Figure 13B (stating that deploying the port diverter causes convergence of the two water flows beyond their natural intersection)]. The patent specifications refer to this process as "constructive interference of converging waves" [*E.g.*, '897 patent, col. 12, ll. 15].

The Court previously found that "surf wake" could be defined as a wake created by the extension of a water diverter which is substantially smoother, larger, and with a higher peak than a non-enhanced wake [Doc. 42 p. 20]. As discussed at the preliminary injunction stage and alluded to above, this interpretation is supported by intrinsic evidence [*See id.* at 19–20]. Although the patents do not provide an explicit definition of "surf wake," Claim 1 of the '897 patent indicates that a "surf wake" is different from a "first wake," and occurs when one of the water diverters is in its second position, extended beyond the side strake ['897 patent, col. 14, ll. 30–32, 45–51]. Similarly, Claim 20 of the '873 patent indicates that a "surf wake" is "different from a wake of said boat moving through water without water diverters engaged" ['873 patent, col. 26, ll. 15–20; *see also id.* col. 26–27, ll. 63–2 (discussing the creation of right and left side asymmetrical wakes suitable for wake surfing that are "different from a non-surf wake of said boat moving through water without said first and second wake modifiers engaged")].

The specifications provide more detail as to what the patentees meant by the term "surf wake," teaching, in relevant part:

Turning to FIG. 5(b), when a starboard surf wake is desired, port side flap 33p is positioned in an outward position while the starboard side flap 33s remains in a neutral position. Since the port side flap is in an outward position and thus extends beyond the port side strake 44p, waves on the port side are redirected, which facilitates constructive interference of converging waves to form a larger starboard wake with a higher peak and smoother face that is suitable for starboard surfing, such as shown in FIG. 6(b). Comparing to the non-enhanced wake of FIG. 6(a) with the starboard wake shown in FIG. 6(b), it is evident that surf wake system 32 modified and/or enhanced the wake with a smooth face and a relatively high peak. As can be seen in FIG. 6(b), waist-high peaks of three or four feet are attainable, thus providing a reproducible wake that is suitable for surfing.

['897 patent, col. 8, ll. 33–47; '873 patent, col. 9, ll. 42–56].

Figures 6(a), 6(b), and 6(c) of both patents (shown below) display the differences between the wakes created by the boat when neither diverter is deployed and when one of the diverters is deployed. As indicated by the white, frothy water, a conventional wake is generally choppy and lacks a smooth face and a high peak [*See* '897 patent, col. 7, ll. 5–12; *id.*, col. 8, ll. 30–32; '873 patent, col. 9, ll. 39–41]. When a diverter is deployed, the side of the wake opposite the deployed diverter is noticeably smoother and has a higher peak than the conventional wake produced when neither diverter is deployed [*See* Figs. 6(a), 6(b) & 6(c)]. Essentially, in a "surf wake," the side of the wake opposite the deployed diverter looks more like a wave

than like a conventional wake produced by a boat [*See* '897 patent, col. 6, ll. 48–52 (discussing ways "to produce the desired waveform")].

*FIG. 6A*

46

*FIG. 6B*

46

**FIG. 6C**

46

Having further examined the intrinsic evidence and the parties' additional arguments, the Court will modify its preliminary construction and construe "surf wake" as the side of a modified wake created by a watercraft traveling through water that is substantially smoother and has a higher peak than a conventional wake [*See* '873 patent, col. 26, ll. 34–38 (indicating that a surf wake refers to a side of a modified wake rather than the entire modified wake, stating, "when said right side upright water diverter produces said left side surf wake, a right side wake is not said right side surf wake") ]. Similarly, the Court defines "non-surf wake" as a wake that lacks a smooth face or a high peak, such as a conventional wake.[7]

Despite the Court's construction of "surf wake" at the preliminary injunction stage, Nautique argues that all of Malibu's claims are invalid as indefinite because they include the terms "surf wake," "non-surf

wake," or "wake surfable by a wake surfing rider" [Doc. 95 p. 26; Doc. 76 p. 8–13]. "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.,* 700 F.3d 509, 517 (Fed.Cir.2012). At the preliminary injunction stage, the Court found that Nautique had not raised a substantial question of indefiniteness, reasoning that the term "surf wake" is amenable to construction [Doc. 42 p. 20]. Since then, however, the Supreme Court issued *Nautilus, Inc. v. Biosig Instruments Inc.,* —— U.S. ——, 134 S.Ct. 2120, 189 L.Ed.2d 37 (2014).

According to Nautique, before *Nautilus,* a claim term "was definite if it were merely 'amenable' to construction" or "was indefinite only if it was 'insolubly ambiguous' " [Doc. 95 p. 24]. Under *Nautilus,* however, "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent,

7. The parties do not appear to dispute the meaning of the term "asymmetrical wake" as it appears in Claim 27 of the '873 patent ['873 patent, col. 26, ll. 61–67; *see also* Doc. 53–9 p. 23 (sealed) ]. In Malibu's summary judgment of infringement briefing, Malibu did not discuss proposed constructions of the term

[*See* Doc. 56 p. 26–28; Doc. 98 p. 34, 37]. And in Nautique's opposition brief as well as its motion for claim construction of the '873 patent, Nautique made arguments regarding "surf wake" and "non-surf wake," but not "asymmetrical wake" [*See* Doc. 82 p. 19–22; Doc. 76 p. 8–13, 24].

and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus,* 134 S.Ct. at 2124; *see also id.* at 2129 ("[A] patent must be precise enough to afford clear notice of what is claimed."). Nautique contends that "surf wake" and "non-surf wake" are "purely subjective and immeasureable" and are ambiguous because a wake that may be surfable to one person may not be to others [Doc. 95 p. 19–20 (discussing *Halliburton Energy Servs., Inc. v. M–I LLC,* 514 F.3d 1244, 1253 (Fed.Cir.2008) (affirming that "fragile gel" was indefinite by clear and convincing evidence pre-*Nautilus* because patent owner failed "to identify the degree of the fragility" and an ordinary artisan would not know which fluids were fragile gels, as that term was used in the patent)) ]. But having analyzed the case law and the specifications, and compared Figures 6(b) and 6(c) to Figure 6(a), whether one side of a wake has a substantially smoother face and higher peak than a conventional wake is a determination that can be made with "reasonable certainty." *Nautilus,* 134 S.Ct. at 2124.

The Supreme Court noted that "absolute precision" is not required and that "[s]ome modicum of uncertainty . . . is the price of ensuring the appropriate incentives for innovation." *Id.* at 2128–29 (internal quotation marks and citation omitted). While Nautique has submitted expert testimony that a conventional wake is surfable and

should therefore qualify as a surf wake [*see* Doc. 95–10 ¶¶ 26, 61], the Court will "discount any expert testimony that is clearly at odds" with the patent's written description. *Kara Tech. Inc. v. Stamps.com Inc.,* 582 F.3d 1341, 1348 (Fed.Cir. 2009) (citation omitted). Even Nautique's own documents and statements support that persons in the watersport boat industry understand what a surf wake is [*See* Doc. 9–5 p. 61 ("Customers love the fact that [the system] is adjustable. Each person can design the perfect surf wake for them."); *id.* ("Customers love the long surf wake the [Nautique Surf System] creates."); Doc. 55–1 p. 41 (sealed) ]. For the reasons discussed above, the Court does not find the terms "surf wake" or "non-surf wake" to be indefinite.[8]

And to the extent Nautique asserts that the term "asymmetrical wake," which appears in Claims 27 and 28 of the '873 patent, is indefinite [*see* Doc. 51–8 p. 20], the Court disagrees. First, the specification gives meaning to the term [*See, e.g.,* '873 patent, col. 3, ll. 61–64; *id.,* col. 8, ll. 10–25 (discussing the normal, symmetrical convergence of the water flows behind the boat, as shown in Figure 6(a)); *id.,* col. 13, ll. 20–30 (discussing, in the context of Figure 13, delayed convergence of the water flows behind the boat) ]. Second, those skilled in the art appear to understand the scope of the term, as evidenced by Nautique's acknowledgement that redirecting

---

**8.** The Court's conclusion is bolstered when considering the clear and convincing evidence standard that appears to have survived *Nautilus. See Halliburton Energy Servs., Inc. v. M–I LLC,* 514 F.3d 1244, 1249–50 (Fed.Cir. 2008) (stating that the standard for indefiniteness is met "where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area"); *In re Maxim Integrated Prods., Inc. MDL No. 2354,* No. 12–244, 2014 WL 3696137, at \*4 (W.D.Pa. July 23, 2014) ("[A] party challenging the validity of a patent . . . must still satisfy the clear and convincing evidence standard, even after *Nautilus.*"); *Hand Held Prods., Inc. v. Amazon.com,* No. 12–768–RGA–MPT, 2014 WL 5779416, at \*4 (D.Del. Nov. 5, 2014) (stating that the Supreme Court in *Nautilus* "expressly discussed the presumption [of a patent's validity] and burden of proof and made no mention of changing or eliminating either").

water with an extended diverter generates "an asymmetric wake pattern" [*See* Doc. 53–9 p. 23, 25, 28 (sealed); *see also* Doc. 95–10 ¶ 26 (stating in a Nautique expert report that when neither water diverter is engaged "the watercraft produces a substantially symmetric wake"); Doc. 82–4 (stating in a Nautique expert report that, "depending on conditions, extending a wave plate may not produce an asymmetrical wake") ].

### 5. Substantially Unsuitable for Left/Right–Foot–Forward Surfing

Claim 1 of the '873 patent recites that when the port diverter produces a starboard side surf wake "for right-foot-forward wake surfing, a port side wake is substantially unsuitable for left-foot-forward wake surfing" ['873 patent, col. 25, ll. 18–25]. Conversely, when the starboard diverter produces a port side surf wake "for left-foot-forward wake surfing, a starboard side wake is substantially unsuitable for right-foot-forward wake surfing" [*Id.*]. In support of its motion for summary judgment of noninfringement, Nautique contends, similar to its approach to the term "surf wake," that "substantially unsuitable" for left-or right-foot-forward wake surfing is indefinite because some persons, like accomplished athletes, can surf with either foot forward on either side of the wake when a water diverter is engaged [*See* Doc. 93 p. 14; Doc. 76 p. 13–15].

Malibu responds that, by looking at the intrinsic evidence, "substantially unsuitable" can be defined with reasonable certainty [*See* Doc. 107 p. 23–24 (citing *Nautilus*, 134 S.Ct. at 2124 (holding that, for purposes of assessing indefiniteness, the claims must be read in light of the specification and prosecution history)) ]. The Court agrees. The specification supports that starboard side surf wakes are generally more readily surfable by right-foot-

forward wake surfers, that port side surf wakes are generally more readily surfable by left-foot-forward wake surfers, and that the wake on the same side as the deployed water diverter is not substantially suitable for surfing because it does not have a substantially smooth face or high peak [*See* '873 patent, col. 3, ll. 25–29 ("Various embodiments disclosed herein can relate to a boat configured to generate a starboard side surf wake for at least goofy-foot wake surfing and a port side surf wake for at least regular-foot wake surfing.") [9] (emphasis added); id., col. 10, ll. 10–17 (describing how the invention allows for quick switching between port and starboard side surf wakes, "thus accommodating both regular (or natural) and goofy surfers, as well as surfers that are sufficiently competent to switch from a port side wake to a starboard side wake while underway"); id., col. 9, ll. 39–41 (explaining that a conventional wake lacks a smooth face and high peak "and is thus not suitable for surfing"); id., col. 13, ll. 9–19 (stating that when "a surfable starboard side wake is desired, the operator may deploy the port side flap" to disrupt the flow of water "to form a larger starboard wake with a higher peak and smoother face that is suitable for starboard surfing"); *see also* Figure 6].

Collectively, the intrinsic evidence demonstrates that a port side wake is substantially unsuitable for left-foot-forward wake surfing if the port side wake lacks a smooth face and high peak. Similarly, a starboard side wake is substantially unsuitable for right-foot-forward wake surfing if the starboard side wake lacks a smooth face and high peak. Thus, similar to "surf wake," the term "substantially unsuitable" does not render the claims indefinite.

---

9. The prosecution history explains that "regular" refers to left-foot-forward surfing and "goofy" refers to right-foot-forward surfing [Doc. 76–6 p. 11].

## C. Infringement

■ Having construed the claims, the Court proceeds to the second step of the infringement analysis: "a factual comparison of the claimed invention to the accused device, which is done by the fact finder." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1467 (Fed.Cir.1998). To prove literal infringement, Malibu must show that the accused device "contains every limitation in the asserted claims." *Id.*

Malibu asserts that "[b]ecause the parties do not dispute any relevant facts regarding Nautique's [Surf System]-equipped boats and disagree only on how to interpret the patent claims, 'the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment.'" [Doc. 98 p. 8 (quoting *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1320 (Fed.Cir.2012), and citing *IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1121 (Fed.Cir.2011) (affirming grant of summary judgment because "[t]he parties' infringement arguments each depend entirely on their respective claim constructions."))]. The Federal Circuit, however, "has explained that the infringement question collapses into one of claim construction only where the parties agree that the accused product infringes under one claim construction and that the accused product does not infringe under an alternative claim construction." *Genentech, Inc. v. Trustees of Univ. of Pa.*, 871 F.Supp.2d 963, 971 (N.D.Cal.2012) (citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1302 (Fed.Cir.2011)).

■ Determining literal infringement is a question of fact, but a court may determine it on summary judgment "'when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device.'" *EMD Millipore Corp. v. AllPure Techs., Inc.*, 768 F.3d 1196, 1200–01 (Fed.Cir.2014) (quoting *In-*

novention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1319 (Fed.Cir.2011)).

### 1. The Accused Product

The material characteristics and operation of Nautique's boats equipped with the Nautique Surf System ("NSS") are undisputed [*See* Doc. 56 p. 9 (Malibu's Opening Brief of Infringement) ("Nautique does not dispute any material facts about its boats."); *see generally* Doc. 82 (Nautique's Opposition) (not disputing Malibu's recitation of the facts about Nautique's boats or NSS)]. Nautique's boats each have a hull, exterior side surfaces, a bottom, and a transom [Doc. 56 p. 10]. NSS includes two metal plate-like structures at the stern of the boat, one to port and one to starboard, which Nautique calls WavePlates [*Id.* at 11]. Nautique does not dispute that its WavePlates divert water. As Nautique has stated, "[w]hen deployed, the WAVEPLATE extends outward and down from the transom[,] intercepting and redirecting the flow of water to clean up the opposite wake and form a surf wave like no other boat" [Doc. 51–12 p. 2].

The vertical incline of the WavePlates ranges from 1.03° to no more than 8° on Nautique's various models [Doc. 56 p. 11]. When inactive, an NSS WavePlate is retracted behind the transom [*Id.* at 12]. When engaged, the WavePlate laterally extends beyond the adjacent hull side [*Id.; see also* Doc. 93 p. 10 (conceding that the WavePlates "extend beyond the exterior side surface at the most narrow point of the exterior side surface")]. Each WavePlate moves from its retracted position to its extended or engaged position and vice versa by means of an actuator [*Id.*]. The lateral extension of the WavePlates never deviates from exactly perpendicular by more than 18.23° or 0.62 inches [*Id.* at 14].

The WavePlates can be engaged and retracted at the touch of a button and while the boat is moving in the water [*Id.* at 13]. Nautique's boats have a controller with settings between zero and five that "change the shape of the wakesurf wave" [Doc. 51–18 p. 34]. According to Nautique's owners' manual, "[t]he higher the number the steeper or more 'vert' the wakesurf wave will become," and the lower the number "the more 'ramp' like" and "clean" it will become [*Id.*]. The wave is adjusted "by controlling exactly how much the [WavePlate] is engaged" [Doc. 51–12 p. 2]. And when the boat's speed exceeds thirteen miles per hour, the WavePlates automatically retract [Doc. 56 p. 18–19].

### 2. Literal Infringement

Now the Court must consider whether the limitations of Claims 1, 5, 16, 18, 19, and 20 of Malibu's '897 patent and Claims 20, 22, 27, and 28 of its '873 patent read onto Nautique's accused product. The following chart indicates which claims implicate which disputed claim terms.

| Claim Term | '897 Patent | '873 Patent |
|---|---|---|
| "Side Strake" | All Claims | Claim 22 |
| "Substantially Perpendicular" | All Claims | Claim 22 |
| "Upright" | All Claims | All Claims |
| "Surf Wake" | Claims 1, 5, 19 | Claims 20, 22 |
| "Asymmetrical Wake" and "Non–Surf Wake" | None | Claims 27, 28 |

The Court will begin by assessing whether Nautique's products meet the surf wake limitation. Nautique applies the Court's preliminary construction and makes two arguments: one, that "fact questions abound" and, two, that it is not infringing because its system is simply capable of infringing depending on the end user's use of the system [Doc. 82 p. 20–21 (citing *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1117–18 (Fed.Cir.2002) (clarifying that infringement is not proven *per se* by a finding that an accused product is merely capable of infringing), and *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 995 (Fed.Cir.2009) (holding that fact that candle tin "was reasonably capable of being put into the claimed configuration"—using top cover as a base—"is insufficient for a finding of infringement")) ]. In support, Nautique provides test evidence that indicates the deployment of NSS does not necessarily create a wake that is substantially smoother and with a higher peak than a conventional or non-enhanced wake. *Id.* But the case law cited by Nautique is inapplicable here, where the intended purpose of Nautique's system is to create a surf wake and Nautique's noninfringement argument is based on using NSS in an unusual or unintended manner. *Cf. Hilgraeve Corp. v. Symantec Corp.,* 265 F.3d 1336, 1343–44 (Fed.Cir. 2001) ("[T]ests of an accused device under unusual conditions are not necessarily relevant to an infringement analysis."); *see also High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed.Cir.1995) (finding that an accused device does not infringe if it does not infringe in its normal configuration, even if it may be altered into an infringing configuration under unusual circumstances).

The boat pictured in Nautique's test evidence is leaning significantly to starboard [*See* Doc. 82 p. 20]. As Nautique's expert concedes, to create such results inconsistent with the Court's preliminary construction, the boat's starboard ballast tank was full and the port ballast tank was empty

[Doc. 82–6 ¶ 5; *see also id.* ¶ 7 (deploying the starboard side water diverter even though the boat, given its distribution of weight, had been set up for starboard side surfing, which requires deployment of the port side diverter) ]. Such uneven distribution of weight contradicts Nautique's instruction to distribute weight evenly and, as Nautique acknowledges, "can be detrimental to the wakesurf wave" [Doc. 99–3 p. 6 ("DISTRIBUTE WEIGHT EVENLY, from bow to stern, and also from port to starboard."); *id.* at 5 ("NSS is a very effective tool to adjust the wakesurf wave; however it is not the only option available to you. To further adjust and change the shape of the wave for wakesurfing the boat can be slightly offloaded toward the side of the surfer.... Be sure to avoid offloading the side opposite the wakesurfer as this can be detrimental to the wakesurf wave."); Doc. 51–12 p. 2 ("The NSS is an integrated system that works in conjunction with the WAVEPLATE to allow surfers the ability to create a wave on either side of the boat instantly without the need to offload ballast and people."); *see also* '897 patent, col. 4, ll. 48–51 ("[T]he present invention allows the enhancement of wake without significant pitching or leaning of the watercraft to one side or the other.") ].

Having reviewed the record, the Court finds no genuine dispute that Nautique's products create a "surf wake," as defined by the Court. As Nautique has made clear, when a WavePlate is deployed, it diverts water and forms a wake significantly different than the conventional wake otherwise produced by the boat as it moves through water [*See* Doc. 51–12 p. 2 ("When deployed, the WAVEPLATE extends outward and down from the transom[,] intercepting and redirecting the flow of water to clean up the opposite wake and form a surf wave like no other boat."); *see also* Doc. 51–18 p. 34]. Nautique has held its system out as having the ability to "manipulate the wave form" [Doc. 51–12 p. 2] and has noted that "[c]ustomers love the long surf wake the NSS creates," "love the fact that the NSS provides a perfectly clean surf wave on either side of the boat with the simple push of a button," and love that "[e]ach person can design the perfect surf wake for them" [Doc. 9–5 p. 61]. Nautique's photographs and videos make clear that NSS produces wakes with smoother faces and higher peaks than conventional wakes [*See* Doc. 51–2 Ex. 21–28; Doc. 55–1 p. 35–38].

The Court's finding is further confirmed by a side-by-side comparison of the wakes generated by Malibu's and Nautique's systems [*See* Doc. 98 p. 30; *see also* Doc. 55–1 p. 45 (showing that NSS creates a wake with a substantially smoother face and higher peak whether it is set to setting 0, 2, or 4) ]. When NSS is operated according to Nautique's instructions, extending a WavePlate diverts water and produces an opposite-side wake that is substantially smoother and has a higher peak than the conventional, non-enhanced wake produced when NSS is not engaged—exactly how the wake in Figures 6(b) and 6(c) stand in relation to the wake in Figure 6(a) [*See id.*]. Similarly, and in light of the Court's discussion of "asymmetrical wake" above in the context of indefiniteness, the Court finds no genuine dispute that NSS creates asymmetrical wakes.

The Court next turns to the substantially perpendicular limitation. All claims at issue in the '897 patent and Dependent Claim 22 of the '873 patent include the term "substantially perpendicular," which the Court has construed as approximately perpendicular. In light of Nautique's products' deviations from perpendicular—that is, by between 10.98° and 18.23°, as Nautique emphasizes, or by tenths of an inch, as Malibu emphasizes—and having drawn all justifiable inferences in Nau-

tique's favor, the Court concludes that there is a genuine dispute of material fact whether at least some of Nautique's products meet the substantially perpendicular limitation. *See Genentech*, 871 F.Supp.2d at 971 ("A court may not, 'under the rubric of claim construction, [ ] give a claim whatever additional precision or specificity is necessary to facilitate a comparison between the claim and the accused product. Rather, after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact.'" (quoting *PPG Indus.*, 156 F.3d at 1355)).

Similarly, with regards to "upright," it is undisputed that the WavePlates on Nautique's various boats are inclined between 1.03° and 8° [Doc. 56 p. 11; Doc. 82 p. 18]. The Court has construed "upright" as oriented generally vertically with respect to the boat, allowing for slight inclination. Nautique argues that, even accepting such a construction, a factual question remains whether the accused systems are "upright" [*See* Doc. 82 p. 18]. Having drawn all justifiable inferences in Nautique's favor, the Court agrees. There is a genuine dispute of material fact whether at least some of Nautique's products, which incline up to 8°, satisfy the Court's construction.

■ Accordingly, all claims at issue involve at least one term for which there is a genuine issue of material fact. Both Malibu's motion for summary judgment of infringement and Nautique's motion for summary judgment of noninfringement will be denied.

### D. Validity

■ "It is axiomatic that one cannot infringe an invalid patent." *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361,

1368 (Fed.Cir.2013). "Because patents are presumed valid, 'a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of facts underlying invalidity that no reasonable jury could find otherwise.'" *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1340 (Fed.Cir.2010) (quoting *SRAM Corp. v. AD—II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed.Cir.2006)). "Clear and convincing evidence is such evidence that produces 'an abiding conviction that the truth of [the] factual contentions are highly probable.'" *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed.Cir.2012) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984)).

Nautique's Motion for Summary Judgment of Invalidity [Doc. 95] addresses four separate grounds of invalidity: (1) whether the Svensson patent anticipates claims of Malibu's '897 and '873 patents; (2) whether Malibu's claims are rendered obvious by Svensson in light of MasterCraft's Surf Tabs; (3) whether Malibu's '214 patent is invalid for lack of written description; and (4) whether all claims referring to "surf wake" and related terms are invalid as indefinite. Malibu filed a motion for summary judgment to establish that its patent claims are not anticipated or obvious in view of Svensson [Doc. 91]. Because the Court found during claim construction that neither "surf wake" and related terms nor "substantially unsuitable" for left- or right-foot-forward surfing is indefinite, the Court will proceed to address Nautique's three remaining arguments.

Invalidity, whether based on anticipation, obviousness, or lack of written description, may be decided on summary judgment. *See Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1331 (Fed. Cir.2010) (stating that anticipation, while a question of fact, may be decided on summary judgment if the record reveals no

genuine dispute of material fact); *MRC Innovations, Inc. v. Hunter Mfg., LLP,* 747 F.3d 1326, 1331 (Fed.Cir.2014) (stating that obviousness is a question of law based on underlying factual questions); *Scriptpro, LLC v. Innovation Assocs., Inc.,* 762 F.3d 1355, 1359 (Fed.Cir.2014) (stating that compliance with the written description requirement, while a question of fact, may be decided on summary judgment if no reasonable fact finder could return a verdict for the nonmovant).

### 1. Svensson

Anticipation under 35 U.S.C. § 102 is a question of fact. *ClearValue, Inc. v. Pearl River Polymers, Inc.,* 668 F.3d 1340, 1343 (Fed.Cir.2012). "Anticipation requires disclosure of each and every claim limitation in a single prior art reference, either explicitly or inherently." *In re Omeprazole Patent Litig.,* 483 F.3d 1364, 1371 (Fed.Cir.2007). The Federal Circuit has recognized that "'the recitation of a new intended use for an old product does not make a claim to that old product patentable.'" *Mytee Prods., Inc. v. Harris Research, Inc.,* 439 Fed.Appx. 882, 886 (Fed.Cir.2011) (quoting *In re Schreiber,* 128 F.3d 1473, 1477 (Fed.Cir.1997)).

It appears undisputed that U.S. Patent No. 6,520,104 (the "Svensson" patent) discloses the use of diverters that deploy beyond the side strakes substantially perpendicular to the longitudinal axis of the boat while the boat is in motion [*See* Svensson, Figures 1–4; *id.,* col. 4, ll. 57–62]. Nautique describes Svensson as "nearly a mirror image of the accused Nautique interceptors" [Doc. 95 p. 10; *see also Bristol–Myers Squibb Co. v. Ben Venue Labs., Inc.,* 246 F.3d 1368, 1378 (Fed. Cir.2001) ("[I]t is axiomatic that that which would literally infringe if later anticipates if earlier.") ].

Figure 2 and Figure 4 from Svensson are instructive to the Court's analysis:[10]

Figure 2 depicts a view from the rear of a high speed vessel hull equipped with an embodiment of Svensson.

---

**10.** Figures 2 and 4 from Svensson and their accompanying captions were taken from the PTAB's recent decision granting *inter partes* review of certain claims of the '897 patent [Doc. 150–1 p. 12–13].

The annotated portion of Figure 4 depicts a simplified
basic diagram of an arrangement according to the
invention of Svensson.

Figure 2 of Svensson discloses a boat with a hull, a bottom, and a transom aft the sides; a plurality of plate-like structures, mounted at port and starboard locations of the transom aft of the side strakes; and said plate-like structures, similar to NSS, that extend outward beyond the side strakes. Svensson also discloses, as shown in Figure 4, "rotatable flap members" that, like Malibu's diverters, pivot to extend beyond the side strakes [Svensson, col. 6, ll. 36]. Svensson states that, in Figure 2, "[t]he flap members ... are arranged so as to be capable of being displaced linearly at an angle downwards/outwards" [id., col. 6, ll. 6–9] and that, in Figure 4, "[w]hile the vessel is in motion, the flap members are introduced into a water flow relative to the vessel hull, with the front sides facing towards the water flow" [id., col. 6, ll. 45–48; see also id., col. 4, ll. 59–62 (stating, in the context of Figure 1, that each flap is "capable of being adjusted while the vessel is in motion from being, seen directly from the rear, essentially in line with the plane of the aft side surface to being essentially projecting at right angles from the plane of said aft side surface"); id., col. 8, ll. 1–5 (stating that "the flap member is adjustable, while the ship is in motion, between a non-deployed position ... and the deployed position, projecting substantially perpendicular to the aft side surface")].

Figure 4 also illustrates water being redirected by the water diverter, which is depicted in the second position perpendicular to the longitudinal axis of the hull.

As Malibu highlights, Svensson was primarily intended to resolve the difficulties in maintaining course stability among high-speed, high-transport capacity vessels such as ferries without sacrificing speed [See Svensson, col. 1, ll. 23–26; id., col. 2, ll. 40–46]. But even assuming Svensson is "from an entirely different field of endeavor than that of the claimed invention" or "directed to an entirely different problem," Svensson will still anticipate if it explicitly or inherently discloses every limitation recited in Malibu's claims. In re Schreiber, 128 F.3d at 1478. As the parties' briefs demonstrate [see Doc. 95 p. 15–20; Doc. 92 p. 5, 9–13], because Svensson does not explicitly disclose "surf wake," Nautique's

invalidity argument rests on inherency (i.e., whether the creation of a surf wake is inherent in Svensson).

So whether the '897 and '873 patents are anticipated boils down to whether it can be shown that Svensson "necessarily functions in accordance with, or includes, the claimed limitations," *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1366 (Fed.Cir.1999), that a surf wake is "a natural result flowing from the operation as taught [in Svensson]," *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 961 (Fed.Cir. 2014) (citation omitted), or that a surf wake "must inevitably result from the disclosed steps [in Svensson]," *In re Montgomery*, 677 F.3d 1375, 1380. (Fed.Cir. 2012). In other words, Svensson will anticipate if "the missing descriptive material"—surf wake—"is necessarily present, not merely probably or possibly present." *Trintec Indus., Inc. v. Top–U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed.Cir.2002).

Nautique argues that Malibu's specifications concede that "the water diversion function [is] necessarily caused by the structure based on laws of nature" [Doc. 95 p. 15]. As the Court discussed above, at the outset of the "surf wake" section, Malibu's patents describe the process of "constructive interference of converging waves" [*E.g.*, '897 patent, col. 12, ll. 15]. The patents explain that as boats travel through water, "the watercraft displaces water and generates … diverging stern waves" ['897 patent, col. 7, ll. 3–5; *see also* Figure 13]. "Due to pressure differences and other phenomena, these waves generally converge in the hollow formed behind the watercraft and interfere with each other to form an otherwise conventional wake behind the watercraft" ['897 patent, col. 7, ll. 5–8; *see also* Figure 13]. By moving a water diverter into the flow of water, "water is redirected, which may lead to constructive interference to form a larger wake having a higher peak and a smoother

face, which wake is conducive for surfing" ['897 patent, col. 7, ll. 13–16; *see also id.*, col. 4, ll. 43–51 (stating that "the diverging water *will* enhance the resulting wake on the opposing side") (emphasis added)]. The '873 patent also supports that when such a wake modifier is engaged, an asymmetrical wake suitable for wake surfing forms [*See* '873 patent, col. 3, ll. 61–64; *id.*, col. 8, ll. 10–25].

Malibu responds that "a surf wake is at most a possibility and not a necessary result" because Svensson is directed to vessels with a water-free stern while in motion [Doc. 92 p. 11 (citing Svensson, col. 1, ll. 20–23)]. Malibu's expert observed that (1) when a vessel's stern is water-free, it displaces little or no water, and the resulting wake is likely not suitable for wake surfing; (2) that the flat-bottom shape of the hulls shown in Svensson make it unlikely that a surf wake would be produced; and (3) that Svensson describes deploying the flaps only when the boat's speed exceeds seventeen to twenty-three miles per hour, speeds at which wake surfing is typically impractical [*Id.* at 11–12; Doc. 91–1 ¶¶ 10–13].

Nautique replied to Malibu's observations [Doc. 118 p. 2–18]. First, Nautique argues that Malibu's position that the stern "displaces little or no water" is contradicted by Svensson [*Id.* p. 17]. Figure 4 depicts diverting water flow, the specification states that the water flow "comprises a volume of water below a water surface, the volume of water being under pressure," and Claim 3 recites that the water diverter is extended "entirely along the underwater portion of the aft side surface" [Svensson, col. 6, ll. 50–52; *id.*, col. 8, ll. 8–9; *see also* Doc. 118–1 (stating in Nautique's expert report that it is "physically impossible for Svensson to control the direction of the boat if the boat is skipping across the water at a high speed

as the flaps would not be submerged below the waterline") ].

Second, Nautique cites the results of using the technology disclosed in Svensson on a fishing boat—a boat not designed for water sports [*See* Doc. 118 p. 14 (indicating that the deployment of a water diverter may still result in an opposite-side surf wake) ]. Third, Nautique argues that Svensson is not limited to ferries powered by water-jet units and that there is no indication that Svensson's water diverters cannot or should not operate below a threshold speed [*Id.* at 16 (citing Svensson, col. 1, ll. 25–29) ("The invention can … also be applied to other types of high-speed vessel than passenger ferries, and also to smaller high-speed boats if desired" as well as to boats "which are driven in other ways than by water-jet units"); *see also* Doc. 118–1 (stating, in expert report for Nautique, that Svensson's system, which is used to control roll, pitch, yaw, sway, heave and surge, "has benefits at all speeds") ]. While Independent Claim 1 of Svensson suggests that the water diverter is deployed only when the boat is moving above seventeen miles per hour, Independent Claim 9 is not so limited [*Compare* Svensson, col. 7, ll. 38–45, *with* Svensson, col. 8, ll. 33–40].

And even if Svensson were limited to use in excess of seventeen miles per hour [*see* Svensson, col. 7, ll. 35–36, 44–45 (stating that Svensson must have "at least one propulsion member to propel the hull at a speed in excess of 15 knots," or 17.26 mph) ], that is still within the range that Malibu's inventors characterize as suitable for surfing ['873 patent, col. 11, ll. 27–31 (stating that "the surf wake system may be configured to operate only within various speeds deemed suitable for surfing, and may vary from moving to about 20 mph") ]. When the PTAB preliminarily addressed inherency based on Svensson, it did not view the invention as limited to

high speed water-jet-driven transport ferries [*See* Doc. 150–1 p. 12–14].

Malibu retorts that the views of Nautique's expert "expressly conflict with a finding that Svensson anticipates inherently" [Doc. 144 p. 5]. In the context of whether Nautique's system is infringing, Nautique's expert stated, because hull shape, speed, and other variables affect whether a surf wake is created, "extending a wave plate *may not* produce an asymmetrical wake" and "*does not necessarily* produce a smoother or steeper wake on the opposing side" [*Id.* (quoting Doc. 95–7 ¶ 23) (emphasis added) ]. But even Malibu's patents disclose that they only "facilitate" constructive interference and thereby "may" produce a surf wake [*See, e.g.,* '897 patent, col. 7, ll. 13–17, col. 8, ll. 36–41; '873 patent, col. 3, ll. 64–67, col. 8, ll. 21–25]. The Court, therefore, is not convinced that inherency is precluded because a surf wake may not always be produced when the Svensson system is engaged. *See MEHL,* 192 F.3d at 1366 (looking to whether the relevant limitation, "as claimed," is a natural result flowing from the operation as taught in the prior art); *In re Oelrich,* 666 F.2d 578, 581 (C.C.P.A. 1981) ("[M]ere recitation of a newly discovered function or property, inherently possessed by things in the prior art, does not distinguish a claim drawn to those things from the prior art."); *see also Bettcher Indus., Inc. v. Bunzl USA, Inc.,* 661 F.3d 629, 654 (Fed.Cir.2011) (Reyna, J., dissenting) ("Where all structural elements of a claim exist in a prior art product, and that prior art product is capable of satisfying all functional or intended use limitations, the claimed invention is nothing more than an unpatentable new use for an old product."); *Bettcher,* 661 F.3d at 640 (majority opinion) (holding, in case involving whether prior art knife inherently included the "bearing face" limitation, that jury was free to draw its own conclusion because

that "functional limitation requires more than the ability to bear for a short period of time at an unusually slow speed," as displayed at trial).

In sum, Svensson may necessarily function in accordance with, or include, Malibu's claimed limitations. *See In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349–51 (Fed.Cir.2002) (finding limitation of identifying sprouts "containing high Phase 2 enzyme-inducing potential" to be inherent because, while the patent owner "may have recognized something quite interesting about [the prior art] sprouts," the interesting "enzyme-inducing potential of sprouts necessarily ha[s] existed as long as sprouts themselves"); *see also MEHL*, 192 F.3d at 1366 (noting as irrelevant to anticipation the prior art's concern with guinea pig, rather than human, skin and the prior art's failure to mention hair removal as a goal). The Court, however, cannot say as a matter of law that Svensson anticipates Malibu's patents, in light of the clear and convincing evidence standard, the conflicting expert reports [*compare* Doc. 95–7 ¶¶ 37–42; Doc. 118–1 ¶¶ 13–24, *with* Doc. 95–7 ¶¶ 23–24; *see also* Doc. 91–1 ¶¶ 6–15], and the Court's obligation to make all justifiable inferences in favor of the nonmovant. *See Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir.2011) ("Where there is a material dispute as to the credibility and weight that should be afforded to conflicting expert reports, summary judgment is usually inappropriate."); *see also Cohesive Techs.*, 543 F.3d at 1364–65 ("An accused infringer that introduces a prior art reference and makes a non-frivolous argument that each and every limitation of a claim is found, expressly or inherently, in [that] single prior art reference generally is entitled to have anticipation decided by the finder of fact." (internal quotation marks and citation omitted)).[11] Therefore, the parties' respective motions for summary judgment of invalidity and no invalidity based on anticipation will be denied.

## 2. Obviousness

Under 35 U.S.C. § 103, a patent may not be obtained "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains."

---

11. Malibu claims that the preamble to Claim 16 of the '897 patent is limiting [Doc. 92 p. 10]. The claims in Malibu's '897 patent include the following preambles: "a boat configured to modify its wake for wake surfing," "a surf boat configured to create a wake surfable by a wake surfing rider," and "a surf wake system deployable on a boat, said system configured to modify a wake of said boat for wake surfing" ['897 patent col. 14, ll. 26–27; *id.*, col. 15, ll. 11–13; *id.*, col. 16, ll. 21–22]. The PTAB construed these preambles as not limiting, noting that "these functional limitations merely state the intended purpose" [Doc. 150–1 p. 8]. The Board explained, "[w]e are unable to ascertain any portion of the preamble which further clarifies our understanding of what otherwise appears to be a complete structure recited in the body of the claim" [*Id.*].

The Court agrees and finds that, in both patents, the body of Malibu's claims sets out the complete invention and that the preambles are not necessary to give life, meaning, or vitality to the claims. *See Rowe v. Dror*, 112 F.3d 473, 478 (Fed.Cir.1997) ("[W]here a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention, the preamble is not a claim limitation."). The Court also finds that the case Malibu relies on, *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed.Cir.2003), is distinguishable. Unlike *Eaton*, which involved a very detailed preamble, *see id.* at 1335–36, Malibu's claims are not examples of a claim drafter using both the preamble and the body to define the subject matter of the claimed invention.

Nautique argues that the combination of Svensson and MasterCraft's Surf Tabs renders Malibu's claims obvious [Doc. 95 p. 14]. Malibu responds with a threshold defense, arguing that Svensson cannot be used in an obviousness analysis because it is not analogous art [Doc. 92 p. 13]. "Obviousness is a legal question based on underlying factual determinations, including whether a prior art reference is analogous art." *Function Media, L.L.C. v. Kappos,* 508 Fed.Appx. 953, 955 (Fed.Cir.2013).

■■■■ "To qualify as prior art for an obviousness analysis, a reference must qualify as 'analogous art,' *i.e.,* it must satisfy one of the following conditions: (1) the reference must be from the same field of endeavor; or (2) the reference must be reasonably pertinent to the particular problem with which the inventor is involved." *K–TEC, Inc. v. Vita–Mix Corp.,* 696 F.3d 1364, 1375 (Fed.Cir.2012). To determine the appropriate field of endeavor, courts refer "to explanations of the invention's subject matter in the patent application, including the embodiments, function, and structure of the claimed invention." *In re Bigio,* 381 F.3d 1320, 1325–26 (Fed.Cir.2004). "A reference is reasonably pertinent if it, as a result of its subject matter, 'logically would have commended itself to an inventor's attention in considering his problem.'" *K–TEC,* 696 F.3d at 1375 (quoting *Innovention,* 637 F.3d at 1321).

Malibu highlights what it believes are the patents' different objectives: Malibu's objective is to create a surfable wake behind the boat without needing to list the boat while Svensson's objective is to improve the course stability and maneuverability of high-speed vessels without sacrificing speed [Doc. 92 p. 14]. But different objectives do not necessitate a finding of non-analogous art. *See Jurgens v. McKasy,* 927 F.2d 1552, 1558 (Fed.Cir.1991) (finding that whether prior art, which had

a far different primary purpose, was analogous art was for jury to resolve); *see also Wyers v. Master Lock Co.,* 616 F.3d 1231, 1238 (Fed.Cir.2010) (noting that the Supreme Court has instructed courts "to construe the scope of analogous art broadly, stating that 'familiar items may have obvious uses beyond their primary purposes, and a person of ordinary skill often will be able to fit the teachings of multiple patents together like pieces of a puzzle'" (quoting *KSR Int'l Co. v. Teleflex, Inc.,* 550 U.S. 398, 402, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007))). And even Malibu's inventors note that the "water diverters of the surf wake system may be activated for other purposes such as steering assist" ['897 patent, col. 9, ll. 9–11].

It appears a reasonable jury could conclude that Svensson and Malibu's patents are in the same field of endeavor—for example, as systems that use water diverters or flaps at the transom to divert water flow. As discussed above, Svensson and Malibu's patents disclose highly similar structures. *See In re Bigio,* 381 F.3d at 1325–27 (affirming conclusion that toothbrush and small hair brush were in same field of endeavor because "the structural similarities between toothbrushes and small brushes for hair would have led one of ordinary skill in the art working in the specific field of hairbrushes to consider all similar brushes including toothbrushes").

As for whether Svensson would have been reasonably pertinent, Nautique claims that "those of skill in the art routinely look to trim devices and water diverters, like disclosed in Svensson, to modify the wake for water sports" [Doc. 118 p. 22 (citing Doc. 118–1 ¶ 34)]. Malibu's expert, on the other hand, contends that a person of ordinary skill in the art interested in creating a surf wake on a recreational boat without listing the boat would not

have reasonably turned to Svensson for a solution [Doc. 91–1 ¶¶ 20–21].

 Given the inventions' similar physical structures and different primary purposes, and the conflicting expert opinions, the Court cannot say as a matter of law that Svensson qualifies or does not qualify as analogous prior art. *See State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1069–70 (Fed.Cir.2003) (finding issue of material fact precluding summary judgment given conflicting expert testimony as to whether a prior art reference was analogous); *Jurgens*, 927 F.2d at 1555, 1558 (finding that whether windsock hunting decoy with a goose-head, stake, and windsock body bag is analogous art to the Dacian windsock—hollow dragon's head mounted on pole intended to terrorize enemies in battle—was for jury to resolve). Therefore, the parties' respective motions for summary judgment of invalidity and no invalidity based on obviousness will be denied.

### 3. The '214 Patent and the Written Description Requirement

 To satisfy the written-description requirement, a patent's specification must "reasonably convey[ ] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed.Cir. 2010) (en banc). The Court must conduct an objective inquiry into the four corners of the specification to see whether it "describe[s] an invention understandable to that skilled artisan and show[s] that the inventor actually invented the invention claimed." *Id.*

As Nautique notes, each claim of the '214 patent includes a "wake modifier" limitation, the only description of "wake modifier" in the specification is of a pivoting fin near the centerline of the boat, and none of the drawings in the '214 patent shows or

describes any device attached to the transom [Doc. 95 p. 29–30; Doc. 93 p. 12–13]. Given these details, Nautique argues that the '214's specification cannot reasonably show that Malibu had possession of a wake modifying device attached to the transom as of the '214 patent's filing date. Nautique therefore proposes interpreting "wake modifier" as "pivotal fins attached near the centerline of the boat, forward the rudder" [Doc. 77 p. 9]. Malibu takes issue with Nautique's attempt to import a locational limitation into the term "wake modifier" [Doc. 106 p. 6].

The Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323; *see also Saunders Grp., Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1332 (Fed.Cir.2007) (" 'Even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope.' " (quoting *Innova*, 381 F.3d at 1117)). The '214 patent explains that "the wake modifying system *may include* ... a fin pivotally mounted to the watercraft" and *"generally includes* ... one or more fins pivotally mounted ... along a centerline of the watercraft and forward the rudder" ['214 patent, col. 1, ll. 61–65, col. 3, ll. 57–61 (emphasis added)]. Malibu's expert opined that a person of ordinary skill would not have understood the '214 patent to be limited to centerline fins, especially in light of the patent's original application [Doc. 123 ¶¶ 41–44]. The original application states that the embodiments are only "examples" and "are not intended to be exhaustive or to limit the invention to the precise forms disclosed, and [that] obviously many modifications and variations are possible in light of the above teachings" [*Id.*].

Possibly more important, some of the patent's dependent claims add the "fin" limitation that Nautique argues is necessarily present in the term "wake modifier." *See Liebel–Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 910 (Fed.Cir.2004) ("As this court has frequently stated, the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim."). Claim 1, an independent claim, claims a boat comprising "at least one wake modifier oriented substantially vertically" ['214 patent, col. 7, ll. 25]. Claim 10, a dependent claim, claims "[t]he boat of claim 1, wherein said at least one wake modifier comprises a fin" [*Id.,* col. 8, ll. 20–21; *see also id.,* col. 8, ll. 47–49 ("The method of claim 12, wherein said wake modifier comprises a fin and wherein said actuating comprises actuating said actuator to move said fin."); *id.,* col. 9, ll. 17–18 ("The surf boat of claim 17, wherein said plurality of wake modifiers comprise fins.") ]. Because Nautique seeks to read a limitation into independent claims—fin—that already appears in dependent claims, "the doctrine of claim differentiation is at its strongest." *Liebel–Flarsheim,* 358 F.3d at 910.

■■■■ " 'Compliance with the written description requirement is a question of fact,' and summary judgment is proper if and only if 'no reasonable fact finder could return a verdict for the non-moving party' on the issue." *Scriptpro,* 762 F.3d at 1359 (quoting *PowerOasis, Inc. v. T–Mobile USA, Inc.,* 522 F.3d 1299, 1307 (Fed.Cir. 2008)); *see also Capon v. Eshhar,* 418 F.3d 1349, 1357–59 (Fed.Cir.2005) (indicating that what a patent's original disclosure reasonably conveys to those skilled in the art depends on the nature of the invention, the existing knowledge in the particular field, the extent and content of the prior art, and the maturity and predictability of the relevant technology). In light of the specification and the legal standard, the Court finds that summary judgment in Nautique's favor is inappropriate and, in addition, declines to interpret "wake modifier" as "pivotal fins attached near the centerline of the boat, forward the rudder," as Nautique proposes. The Court instead construes "wake modifier" as a device attached to the boat that, when engaged, modifies the wake as the boat travels through water.

## IV. Conclusion

For the reasons discussed herein, defendant's motion to reconsider the Court's denial of a stay [Doc. 150], plaintiff's motions for summary judgment of infringement and of no invalidity based on Svensson [Docs. 51, 91], and defendant's motions for summary judgment of noninfringement and of invalidity [Docs. 93, 94, 95] are hereby **DENIED.** Because the disputed claim terms have been construed by the Court, defendant's three motions for claim interpretation [Docs. 75, 76, 77] are **DENIED as moot.** Finally, upon review of the record and in light of the parties' representations at the December 16, 2014, hearing, Malibu's Motion to Strike and Alternative Motion for Status Conference [Doc. 80] and Malibu's Motion for Summary Judgment Disposing of Nautique's Ninth Affirmative Defense [Doc. 85] are **DENIED as moot.**

IT IS SO ORDERED.